Filed 10/3/16  Thiel v. MKA Real Estate Qualified Fund CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PENELOPE GAE THIEL, as Successor in Interest to NORMAN M. THIEL,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>MKA REAL ESTATE QUALIFIED FUND I, LLC et al.,<br><br>       Defendants and Appellants. | A144099, A144984<br><br>(Marin County<br>Super. Ct. No. 10-04972) |

**I.**

**INTRODUCTION**

In 2007, Norman Thiel followed a recommendation from his financial advisor Jeffrey Guidi to invest a substantial part of his retirement savings in a private placement securities offering by MKA Real Estate Qualified Fund I, LLC (Qualified Fund).  In 2010, Norman filed this action seeking redress for the loss of his investment, alleging causes of action for fraud, breach of fiduciary duty, negligence and financial elder abuse against Guidi, Qualified Fund and others.  After Norman passed away in 2013, his wife Gae was substituted as the plaintiff in this case in her capacity as Norman's successor in interest.[1]

---

[1] We distinguish between members of the Thiel family by using their first names. No disrespect is intended.

1

At a 2014 bench trial, the only remaining defendants were Qualified Fund and its manager MKA Capital Group Advisors, LLC (Advisors). The trial court found in favor of Gae on all of Norman's causes of action, concluding that Qualified Fund and Advisors (collectively, "MKA")[2] were jointly and severally liable for Norman's damages, either directly or because Guidi was their agent. The court awarded damages totaling $500,000, and statutory attorney fees in the amount of $1,247,709.10. The court also imposed a civil penalty under Civil Code section 3345 in the amount of $570,000, plus compounded prejudgment interest.

In this consolidated appeal from the judgment and postjudgment attorney fee order, MKA contends the entire judgment must be reversed because (1) MKA did not have any independent duty of care with respect to Norman's investment decision; and (2) Guidi was not MKA's agent as a matter of law. Alternatively, MKA challenges various components of the judgment and damages award. We find that the civil penalty the trial court imposed in order to deter and punish MKA was not authorized by Civil Code section 3345 and must be stricken. In all other respects, we affirm the judgment.

## II.

## STATEMENT OF FACTS

### A. The Complaint

The operative pleading is a November 2013 third amended complaint (the complaint), which was filed by Gae after Norman passed away in June of that year. Gae sought damages and rescission for breach of fiduciary duty, fraud, negligence, and financial elder abuse against Guidi; Guidi's partner and business associates; and

---

For several months prior to Norman's death, pretrial proceedings were stayed while Qualified Fund appealed an order denying its motion to compel arbitration of Norman's claims. This court affirmed that order in an unpublished decision filed on November 9, 2012. (*Thiel v. MKA Real Estate Qualified Fund*, 2012 Cal.App.Unpub. LEXIS 8225.)

[2] When practicable, we use the singular term MKA to collectively refer to appellants. However, we sometimes refer to appellants as Advisors and Qualified Fund for clarity sake.

2

Qualified Fund and Advisors.  Gae alleged that Guidi was also affiliated with e-Planning Securities, Inc. (ePlanning), a broker-dealer that was not a named defendant because it had invoked the protection of the bankruptcy court.

In a prefatory paragraph, Gae alleged that each defendant was "acting as an agent, servant, employee, and/or co-conspirator" of the other defendants when doing or omitting to do the acts alleged.  Gae further alleged that when defendants caused the Thiels to lose half their limited savings, they were all aware that Norman and Gae were over the age of 65, were retired and living on a fixed income, and were not sophisticated investors.

Common factual allegations in the complaint told the following story:  In 2002, Norman attended an investment seminar put on by Guidi which was marketed to retirees. On Guidi's recommendation, Norman withdrew "his entire retirement savings of $400,000" from a low risk investment in order to make an investment in two high risk projects.  Guidi falsely represented the nature of the risk to Norman and failed to disclose material facts including that the projects were part of a "Ponzi scheme."  Despite Guidi's alleged misconduct, by 2007 Norman "was able to recover his capital and a reasonable return for its use."  However Guidi then persuaded Norman to invest $200,000 of that money in MKA, a company that provided financing for construction projects.  MKA held itself out as accepting investments "only from 'Accredited Investors,' " but it took no steps to ensure that its investors were accredited, did not "properly vet the individuals and entities through which it accepted subscriptions," and used agents like Guidi who were "purveyors of interests in Ponzi schemes."

Gae alleged that Guidi arranged for Norman to invest in MKA knowing that Norman was not an accredited investor, that the risk was inappropriate for his age, that he "was in failing health, that he was a recent survivor of cancer, and that he was in a particularly vulnerable mental state and lacked the strength to oppose a persistent effort to urge him to make a high risk investment completely inappropriate for an investor in his position."  Furthermore, Guidi "took extreme and illegal measures" to secure Norman's consent to make the MKA investment, which included making false statements about the nature and quality of the MKA investment, and falsely representing that MKA would pay

3

Norman "12% per annum regularly." For a few months, the investment performed as Guidi had promised, but in late 2007 MKA "suddenly" stopped making monthly distributions. Then MKA deducted the already paid distributions from Norman's capital investment. Only then did MKA provide Norman with documentation exposing the high risk and unsafe nature of his investment. Thereafter, Norman's demands for a return of his investment were wrongfully denied by MKA.

## B. Trial Evidence

In August 2014, a court trial was held before the Honorable Mark Talamantes. By that time, the only remaining defendants in the action were the two MKA defendants. On the first day of trial, Guidi's former trial counsel joined the team of attorneys representing MKA. Over the course of five court days, the court heard evidence which substantially established the facts summarized below.

### 1. The 2002 Investments

In 2002, Norman was 64, his net worth was $500,000, and his investments were primarily in mutual funds. Some time that year, Norman met Guidi at an investment seminar where Guidi was a presenter. After Norman attended Guidi's seminar, his conservative investing practices changed.

At Guidi's recommendation, Norman made a $400,000 investment which represented 80 percent of his liquid assets (the 2002 investment) in two projects sponsored by the Asset Real Estate Investment Company (AREI). Guidi told Norman that one of the projects, an assisted living facility, had an expected rate of return of 9 percent, and the other, a real estate development in Utah, had an expected rate of return of either 12 or 13 percent. Gae testified at trial that she had been uncomfortable about the 2002 investment, but Norman "trusted Jeff [Guidi] completely[,] . . . he just thought the world of him."[3]

---

[3] It appears that Gae was unwell at the time of trial. Although she testified, both parties also relied on excerpts from prior deposition testimony. Consequently, Gae's testimony about the pertinent events was incomplete, and somewhat disjointed.

Guidi testified at trial that he was a registered representative of ePlanning when he introduced the two AREI projects to Norman and, as such, ePlanning was his supervisor and the sponsor of investments he shared with clients like Norman. The two AREI projects Guidi showed to Norman were the only "offerings" ePlanning had at that time that "expected to return in the area of 12 percent per annum." After Guidi helped Norman make his 2002 investment, Norman became Guidi's client, and the two met regularly to discuss Norman's "goals," and "what was going on . . . in general."

### 2. *Norman's Failing Health*

In 2002, Norman suffered from cerebral vascular disease which required that he undergo a carotid endarterectomy, a procedure during which a stent is inserted into the carotid artery in order to remove a blockage. The first time the procedure was attempted, Norman "flatlined" and had to be resuscitated, but on a subsequent occasion the stent was successfully inserted. In 2004, Norman had the procedure again in his other carotid artery.

In 2006, Norman and Gae sold their home but could not afford to buy another one in Marin County. When the couple contemplated a move to a retirement trailer park, their daughter Laura suggested they move into her home. Laura had been living in an in-law unit and renting out her house to supplement her own income. In October, the Thiels purchased an interest in Laura's home and moved there. By that time, Norman was suffering from Chronic Obstructive Pulmonary Disease (COPD) and had to use an oxygen tank every day. He used a portable tank which he took with him when he left the house.

By the spring of 2007, there were marked changes in Norman's mood and health. He became short-tempered and frustrated when trying to balance his checkbook so Laura took over that task from him. He slowed down generally and stopped doing handyman repairs around the house. He had arthritis in his neck and back, started using a cane, and became hunched over. He became sedentary, slept a lot and had a chronic bad cough which would almost make him stop breathing. In April of that year, Norman was diagnosed with prostate cancer which was treated with hormone suppression therapy and

six weeks of radiation. He was in a lot of pain and very tired. Around that same time, Norman received a final payment from his 2002 investment in the AREI deal.

Norman earned approximately $192,000 on his 2002 investment, and when AREI returned his $400,000 principal, Norman called Guidi for help reinvesting it. Norman became fixated on the idea of making another investment that would make 12 percent again and not lose any of his principal. Norman's family was unable to convince him that his goal of achieving another 12 percent return was unrealistic.

### 3. MKA

MKA is a set of funds that lends money to builders involved in different facets of the construction industry. The three primary funds are the "Opportunity Fund," the "Qualified Fund," and an offshore fund. The Opportunity Fund was the original fund established in 2002. The Qualified Fund was subsequently established in an effort to overcome financial problems experienced by the Opportunity Fund. The funds do not have their own officers, directors, or employees; all of their acts, including accounting and investment activities, are performed by MKA's manager, Advisors.

Brian Wagoner is Advisors's executive vice-president of finance. Wagoner testified at trial that the Qualified Fund is "a private fund comprised of members' equity" and is different from the Opportunity Fund because it cannot take on debt. When asked how MKA secured investors for the Qualified Fund in 2006-2007, Wagoner gave this answer: "If I understand the question correctly, we used a private placement. I think we fell under some SEC rule like a regulation D offering. If I understand your question, it just means that we couldn't solicit directly. We had to use a broker dealer. All investors had to be accredited. And there was a number limit. We had to keep it below five hundred" investors.

ePlanning was one of the broker-dealers that MKA used to locate investors for the Qualified Fund. In June 2006, MKA and ePlanning executed a Placement Agent Agreement (the 2006 PAA), pursuant to which MKA engaged ePlanning to act as its nonexclusive placement agent and broker in selling units in the Opportunity Fund. Wagoner testified that, although the 2006 PAA was originally executed for the

6

Opportunity Fund, the parties used the same agreement for Qualified Fund. Advisors's president, Jason Sugarman, signed the 2006 PAA on behalf of MKA.

By executing the 2006 PAA, ePlanning expressly assumed enumerated duties with respect to investments in the MKA funds, which included: (1) using "standard reasonable efforts to procure qualified subscribers for the Units on the terms described in [the fund's] Offering Memorandum"; (2) distributing offering materials to potential investors which had been prepared by MKA, including an offering memorandum, a financial statement and a "Purchaser Questionnaire"; (3) assisting potential investors in understanding offering materials and using best efforts to ensure that clients read all pertinent material before investing; and (4) complying with all pertinent laws, rules and regulations.

MKA's duties under the 2006 PAA included collecting Purchaser Questionnaires delivered by ePlanning; "review[ing] the representations set forth in each Purchaser Questionnaire by each prospective investor," and using its sole discretion to "decide whether to accept the offer to invest made by each prospective investor." MKA also agreed that, to the extent it offered to sell units directly, it would perform all the duties assigned to the broker under the agreement.

Advisors's executive vice-president of finance Wagoner testified that when new or existing members purchased units in a MKA fund, they had to complete a subscription booklet which included a subscription agreement, information about the specific investment, and an investor worksheet. Wagoner represented that he reviewed "every single subscription document" that was generated in connection with the purchase of a membership unit in an MKA fund. Wagoner also testified that "every single investor" in the Qualified Fund was an accredited investor—that "[t]hey had to be."

### 4. Norman's 2007 Investment

In the spring of 2007, after Norman called Guidi for investment advice, Norman was asked to complete an ePlanning "New Account Application." On May 30, 2007, Norman completed the form in handwriting. Norman estimated his net worth as $800,000, attributing $200,000 to the value of his residence. He reported his "Risk

Tolerance" as "Conservative for Income." He identified his employer as "Retired," his source of funds as "IRA Transfer," and his source of net worth as "Lifetime Of Accumulation."

In the spring or summer of 2007, Guidi and Norman had a few telephone conversations about Norman's desire to make another investment. Guidi testified that he told Norman about some "REITS" he thought would be appropriate, but Norman wanted a higher return. Guidi testified he also mentioned MKA and Norman seemed interested in that. Laura, who was living with her father at that time, testified Guidi took several months to find an investment for Norman, and Guidi did not tell Norman about a REIT or any other investment opportunity during their telephone conversations in 2007.

On July 2, 2007, Guidi met with Norman and Gae at his office and arranged for Norman to purchase a one membership unit interest in MKA's Qualified Fund. Norman did not speak to anyone employed by MKA prior to that meeting, and Gae testified at trial she did not think Guidi and Norman discussed the MKA investment opportunity prior to that meeting. Guidi "ran the whole show," he was "very, very persuasive about what [Norman] could do," and he convinced Norman that MKA was a good investment for Norman to make.

Gae testified Guidi told Norman "we have to act really fast on this MKA project." Laura also recalled her father told her that when Guidi presented the MKA investment, he told Norman that "there was this short period of time. He had to sign now or the window would close . . . ." At trial, Guidi acknowledged there was no time restriction associated with the MKA investment, and he denied suggesting there was one.

During the July 2007 meeting, Gae objected to Guidi's proposal, calling the investment "not . . .good . . .at all" and a "worst" choice, but Guidi was talking fast, saying it was such a good idea, and making assurances that "it'll be okay; it is a good investment . . . [a]nd they have a good reputation." Norman did not look or feel well; Gae later recalled that Norman was not "in his right mind" at that meeting, but that "there was no turning him back." At trial, Guidi acknowledged Gae objected to the MKA investment. Guidi testified that, because Gae objected, he suggested Norman take time to

8

think about it or just invest half the $400,000, and Norman decided he did not want to wait, but that he would follow Guidi's suggestion to limit his investment to $200,000.

Gae testified Norman did not have to sign many papers "to get the project started in his name." Guidi had Norman sign three documents at the July 2007 meeting. First, Norman signed a new version of an ePlanning "New Account Application" that had been completed in handwriting by someone other than Norman. Some of the information on this form was the same as the information on Norman's May 2007 New Account Application, including, for example, that Norman's "Risk Tolerance" was "Conservative for Income." However, the July 2007 version of the form did not state that Norman was retired, but reported instead that he was employed by "Miller Pacific" as an "Engineering/Contractor," and that his estimated net worth was $1.067 million.

At trial, Guidi testified he told Norman that he had to be an accredited investor in order to make an investment in MKA, which meant his net worth had to exceed $1 million. On the first day of Guidi's trial testimony, he could not recall whether he had ever seen the May 2007 New Account Application in which Norman reported a net worth of $800,000. On the second day of his testimony, however, Guidi recalled he did see that application prior to the July meeting. Guidi also recalled the reason he previously told Norman about the REITS was because Norman initially reported his net worth as lower than $1 million, and the REITS did not have accredited investor requirements.[4] According to Guidi, when he raised the accredited investor requirement at the July 2007 meeting, Norman told him that the numbers he put down on the May 2007 form were not accurate, and that his net worth was higher than $800,000. So Guidi helped Norman calculate his net worth and complete a new form.

The second document Norman signed at the July 2007 meeting stated: "I understand that e-PLANNING Securities, Inc. recommends limiting accredited investors to no more than 20% of net worth invested in Limited Partnership or Limited Liability

---

[4] Laura testified that Norman told her that MKA was the only investment opportunity that Guidi offered to Norman in 2007.

Corporations as an asset class. Our broker has advised us of these guidelines and I wish to exceed this recommendation with this investment in MKA Real Estate Qualified Fund I, LLC. My net worth is $1,067,000, and attached is the paperwork for the above-mentioned investment."

Finally, Norman signed a MKA Subscription Booklet, which included an agreement to purchase a membership unit in Qualified Fund for $200,000. Norman's initials appear next to a statement in the booklet which indicated that he had a net worth of more than $1 million.

When Norman made his MKA investment, members of the Qualified Fund were receiving monthly distribution payments calculated to result in a 12 percent annual return on their investments. However, near the end of 2007, MKA suspended monthly distribution payments because of cash flow problems. In July 2008, Advisors notified Norman it had re-characterized the monthly distribution payments that were made to him in 2007 as a partial return of his capital contribution. In October 2008, Advisors notified investors that their "right" to withdraw from Qualified Fund had been suspended and that every prior acceptance of a request to redeem an investment in that fund was being reversed.

### 5. *Guidi's Arrest*

On May 21, 2009, Guidi and his business partner Gary Armitage were arrested and charged with approximately 70 felonies. Guidi testified the charges arose out of his relationship with AREI, which turned out to be a Ponzi scheme, and all charges against him were dismissed after he paid approximately $300,000 to three former clients and surrendered his securities license.

When Norman learned Guidi had been arrested and charged with fraud, he admitted to Laura that his faith in his investment advisor was finally broken and said he was going to hire an attorney "to fight MKA." On June 9, 2009, an attorney named Vernon Watters sent a letter to MKA demanding a return of Norman's investment. Watters outlined concerns that Norman's investment had been secured through fraud. He also identified Guidi as the "advisor" who arranged Norman's investment in Qualified

10

Fund, and stated that Guidi was in jail pending trial on charges of fraud. Watters proposed that "Guidi's relation with the Fund and its constituent members needs to be explored." Watters also requested someone from MKA contact him by phone or e-mail.

One month later, Advisors's general counsel, Daniel White, responded to Watters on behalf of MKA. In a letter which was sent to a different address than appeared on Watters's letter, White stated: "Please be advised that all redemptions have been suspended, as well as all preferred distributions. Nothing contained in your letter explains why your clients should be redeemed from MKA before other investors. Consequently, the Thiels will be treated exactly the same as other investors." White did not offer to discuss the matter further, although he did advise Watters to "direct all further communications" to him.

At trial, White testified that he interpreted Watters's letter as a request for both a distribution and redemption of Norman's 2007 investment. White recalled the letter mentioned that Guidi had been arrested, so he talked with Advisors's personnel to determine whether there was any relationship between MKA and Guidi "and they said no." White also recalled he reviewed documents in MKA's file pertaining to Norman's investment and "there didn't seem to be anything wrong [with them] or any red flags." So, "a few days afterwards," he wrote back to Norman's lawyer that the Fund did not have any money to distribute, and it was not accepting redemptions.

White testified some other "MKA personnel, not legal" was responsible for vetting MKA's broker-dealers before they were engaged by MKA. However, before denying a redemption request, he "would have" checked the "FINRA" Web site to make sure the broker-dealer that arranged the investment was in good standing. White, who had participated in proceedings before FINRA, described that body as an industry organization that regulates broker-dealers and the people who work for them. Under cross-examination, White admitted he did not "run any FINRA check on Mr. Guidi."

Under cross-examination, White was asked several times whether MKA had a complete file of documentation pertinent to Norman's 2007 investment, including a purchaser questionnaire. White's answers were so evasive that the court expressed

11

frustration at his "hyperbole," and "concern[] about this witness." Ultimately, White essentially admitted that MKA's file included Norman's purchaser questionnaire even though the document was not produced in response to plaintiff's discovery request. White also confirmed MKA did have a complete file when they rejected Norman's request for a return of his investment.

### 6. Expert Evidence Regarding Undue Influence and Elder Abuse

Dr. Jonathan Canick is a clinical psychologist and neuropsychologist who was qualified as an expert in the areas of neuropsychology; undue influence as it affects seniors; and evaluating the cognitive capacity of an individual. Canick testified that in July 2007, Norman was "cognitively compromised and disordered," that his "level of disorder made him highly vulnerable to undue influence," and that he was "a victim of elder financial abuse." Canick explained that Norman suffered from hypoxia, which is a lack of proper oxygenation of the brain that causes "confusion, memory problems, organizational problems, difficulty initiating, executing, things like that."

At trial, the defense objected that Canick could not use Norman's medical records as evidence of his hypoxia because those records had not been authenticated. Therefore, Canick used prior interviews with Norman's family and friends to identify several circumstances about Norman's health and lifestyle which supported his expert opinion. Pertinent health factors included Norman's daily use of oxygen, his long history of severe COPD, his heart condition, and his prostate cancer. Pertinent lifestyle factors included that Norman was a smoker, was sedentary and suffered from significant fatigue.

Canick testified that hypoxia is a documented side effect of COPD; of undergoing a carotid endarterectomy; and of the medication used to treat Norman's prostate cancer.[5] Furthermore, the effects of hypoxia can be compounded by smoking and inadequate

---

[5] Canick testified that between 2002 and 2006, carotid endarterectomies were performed on patients who had "dramatic symptoms like passing out, falling asleep, extreme kinds of symptoms." Furthermore, although effective to treat the heart condition, the procedure has fallen out of favor because it often causes patients to suffer "little mini-strokes," which significantly diminish brain function.

sleep. Changes in Norman's lifestyle that were consistent with a cognitive impairment included the fact that after 2006 Norman was no longer able to engage in his hobby of fixing things around the house, and he was unable to do full time work because "he was so weak and compromised." In 2008 his driver's license had to be taken away, which reflected that a "very executive kind of function, driving, . . . was really compromised."

Canick opined that Norman's "perseveration" was another manifestation of his cognitive impairment. For example, after Norman had his license taken away by the authorities he continued to drive. Similarly, in the spring of 2007 he fixed on the idea of making another investment with a 12 percent return.

### 7. *Expert Testimony Regarding Securities Industry Standards*

Preston DuFauchard is a private consultant, attorney, and former commissioner of the California Department of Corporations who offered expert testimony about industry standards relating to the sale of private placements. DuFauchard testified that securities are distributed either through public offerings or private placements and the primary distinction between the two methods is that private placements are exempt from the registration requirements of the securities laws and "need to be sold in a way that maintain[s] that exemption."

According to DuFauchard, the standard way to conduct a private placement is for the issuer to identify a broker dealer and to "use that broker dealer to make sure that the broker dealer's clients are accredited investors" so that the issuer can maintain its exemption from the registration requirements of federal securities law. Furthermore, a "general solicitation" of a private placement will cause the issuer to lose its exemption. Therefore, unless the issuer "knows of a population of willing investors, then the issuer will typically use a registered broker dealer who does have preexisting relationships to make the offering available to investors."

DuFauchard testified that it is standard industry practice for the issuer of a private placement offering to "assign responsibility to the broker dealer to scrub its clients to make sure that they had the sufficient net worth to invest in the fund and [to] also put certain constraints on the broker dealer so that the issuer would not lose its exemption

13

from registration." One constraint typically imposed on the broker dealer is to ensure that investors who are referred to the fund are accredited investors. In 2007, an accredited investor was defined as someone with a net worth of $1 million.

DuFauchard opined that the 2006 PAA is a routine contract consistent with industry practice. DuFauchard also testified that devising a relationship in which an entity like Advisors manages a set of funds like the MKA funds is consistent with industry standards.

### C. The Trial Court's Decision

The parties filed written closing arguments and proposed statements of decision, and the court issued a tentative decision which was subject to objections and a hearing. Then, on January 8, 2015, the court filed an 18-page statement of decision which set forth findings of fact and law in favor of Gae on her causes of action for negligence, breach of fiduciary duty, fraud and financial elder abuse.[6]

#### 1. Negligence

Holding MKA directly liable for negligence, the trial court first found that a "private placement fund owes a duty of care to an elderly investor in the absence of privity of contract." It reached that conclusion by applying a multi-factor test set forth by our Supreme Court in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 648 (*Biakanja*). Under that test, the court found, among other things, that (1) the 2006 PAA between ePlanning and MKA was intended to affect Norman; (2) MKA ignored "red flags" in Norman's application file; (3) the harm Norman suffered was foreseeable to MKA; (4) MKA's conduct was closely connected to the injury that Norman suffered; (5) MKA's conduct was worthy of moral blame; and (6) imposing a duty on MKA was consistent with public policy.

As further support for its finding of a duty, the trial court applied a supplemental test set forth in *Bily v. Arthur Young & Co* (1992) 3 Cal.4th 370, 398 (*Bily*), concluding

---

[6] The court found that Gae failed to establish that she was entitled to the remedy of rescission. That finding is not at issue on appeal.

14

that imposing a duty on MKA under these facts would not create a risk of disproportionate liability. In this regard, the court emphasized that the Thiels were not sophisticated investors, and this case involved "a senior losing his retirement due to conduct of an overzealous agent."

After finding a legal duty of care, the court then concluded that MKA breached its duty by accepting Norman's 2007 investment without appropriately monitoring the conduct of its registered representative, and without conducting an appropriate review of Norman's investment file or taking reasonable steps to ensure that Norman was an accredited investor.

### 2. Breach of Fiduciary Duty and Fraud

The trial court found that Guidi assumed a fiduciary duty by holding himself out to Norman as a trustworthy and capable financial advisor. He then breached that duty by "steering" Norman to "an unsuitable high risk investment for an ailing senior," and by telling him "that time was of the essence." Guidi also committed fraud by making knowingly false representations including that (1) MKA was an appropriate investment for Norman; (2) Norman's net worth was higher than it was; and (3) time was of the essence because the investment opportunity was closing. In reaching these conclusions about what Guidi said and did, the trial court made an express finding that Guidi was not a credible trial witness.

In analyzing the evidence of fraud, the court found that Guidi knew he was pressuring Norman to make an investment that represented more than 20 percent of his net worth. Guidi "expressly made a note" of that fact on the ePlanning client form and, at the same time, the court found, "Guidi reported on the form that his client's income was $1,067,000, which conveniently meets the 20% benchmark when investing $200,000.00."

The court further concluded that MKA was vicariously liable for damages resulting from Guidi's breach of fiduciary duty and fraud because Guidi was MKA's agent when he arranged for Norman's 2007 investment in Qualified Fund. (Civ. Code, § 2295.) To support its finding of an agency relationship, the court relied primarily on the parties' actions and statements, including evidence that MKA needed

15

ePlanning/Guidi to secure investors for Qualified Fund, and that the parties manifested their consent to an agency relationship by executing the 2006 PAA.

### 3. Elder Abuse

In holding MKA liable for financial elder abuse (Welf. & Inst. Code, § 15610.30), the court appears to have relied primarily on an agency theory of vicarious liability, but it also made findings about MKA's direct liability.

With regard to vicarious liability, the court found that Guidi committed elder abuse by "taking and obtaining [Norman's] $200,000.00 and by encouraging [Norman] to purchase an investment in MKA with a level of risk that was not appropriate for a person of his age, health, and financial circumstances." In reaching this conclusion, the court credited Gae's testimony about what happened at the July 2007 meeting as well as expert testimony showing that Norman was susceptible to undue influence. It also found that Guidi knew Norman did not qualify to be an investor in MKA but "he pushed it through anyway exposing his client to great loss, and MKA through the agency contract with ePlanning to great liability." Finally, the court found there was clear and convincing evidence that Guidi acted with fraud, oppression and malice.

Addressing MKA's direct conduct, the court reiterated that "MKA was negligent by both not catching the irregularities contained in its investor file, and because it did not properly monitor Mr. Guidi as its registered representative." Beyond that, the court found that MKA also "retained Mr. Thiel's money" when it "knew or should have known that keeping the money would be harmful to him."

### 4. Damages

Recognizing that "even a conservative investment would most probably have lost value after the stock market crash of 2008, and part of [Norman's] investment was redeemed," the court awarded Gae compensatory damages in the amount of $100,000. As additional damages for financial elder abuse, Gae was awarded emotional distress damages in the amount of $400,000, and her attorney fees and costs. (Welf. & Inst. Code, § 15657.5.)

16

The trial court did not award punitive damages, but it did impose a civil penalty to deter and punish MKA. (Civ. Code, § 3345.) The $570,000 penalty was calculated by using a base amount of $200,000, and applying a multiplier of 2.85. The court awarded prejudgment compounded interest on the penalty at a rate of seven percent. Finally, the court found that Qualified Fund and Advisors were joint and severally liable and vicariously liable for all damages, penalties, interest, fees and costs.

### D. Judgment and Attorney Fee Award

A January 15, 2015 judgment incorporated the damages award from the statement of decision. On April 10, 2015, the court issued an "Amended Judgment, *nunc pro tunc*, after motion and hearing on April 10, 2015." The amended judgment "clarifi[ed]" that the MKA defendants were joint and severally liable for Norman's damages by adding the following sentence to the judgment: "Culpability is shared on an equal basis. (The defendants are joint and severally liable for all damages, meaning the plaintiff may collect all or some of the damages from any one or several of the liable parties.)" The amended judgment also added a provision that July 5, 2007, was the start date for the accrual of prejudgment interest on the civil penalty.

On April 10, 2015, the court filed a 19-page postjudgment "Attorneys' Fee Order." Pursuant to an analysis that MKA does not challenge on appeal, the trial court awarded Gae attorneys fees in the total amount of $1,247,709.10.

### III.

### DISCUSSION

### A. MKA's Direct Liability for Negligence

We begin with MKA's claim that it has no direct responsibility for any injury suffered by Norman. MKA contends the direct negligence finding must be reversed because MKA did not have a duty to (1) supervise Guidi, (2) "ferret out something in ePlanning's file," or (3) return Norman's investment after Guidi was arrested. This argument conflates two distinct issues: duty and breach.

" 'Actionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury.'

17

[Citation.]" (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573 (*Beacon*).) " 'The existence of a legal duty to use reasonable care in a particular factual situation is a question of law for the court to decide. [Citation.] However, the elements of breach of that duty and causation are ordinarily questions of fact for the jury's determination. [Citation.]' [Citation.]" (*McGarry v. Sax* (2008) 158 Cal.App.4th 983, 994.)

### 1. Duty

" 'A judicial conclusion that a duty is present or absent is merely " 'a shorthand statement . . . rather than an aid to analysis . . . . "[D]uty," is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " [Citation.] "Courts, however, have invoked the concept of duty to limit generally 'the otherwise potentially infinite liability which would follow from every negligent act . . . .' " ' [Citation.]" (*Beacon*, *supra*, 59 Cal.4th at p. 573.)

"A duty may arise through statute, contract, or the relationship of the parties. [Citation.]" (*National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc*. (2009) 171 Cal.App.4th 35, 45 (*National Union Fire*).) "The factors to be considered in determining whether a duty of care exists based on the relationship between two parties in a commercial context who are not in privity were established in *Biakanja* [*supra*,] 49 Cal.2d [at p.] 650.]" (*National Union Fire*, at p. 45.) As discussed in our factual summary, the trial court applied the *Biakanja* factors to reach its conclusion that a private placement fund owes a common law duty of care to an elderly potential investor.[7]

*Biakanja*, *supra*, 49 Cal.2d at page 650 established the following test: "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among

---

[7] Surprisingly, MKA does not address the trial court's duty analysis in its lengthy appellate briefs.

18

which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.  [Citations.]"

Here, the trial court found the 2006 PAA was clearly intended to affect Norman. It delegated responsibility to Guidi to evaluate whether potential investors were appropriate based on criteria established by MKA; and it also delegated responsibility to ePlanning to generate documentation about the prospective investor that Advisors would use to decide whether to accept the investment.  Furthermore, the harm Norman suffered was foreseeable to MKA.  The investment "flowed from a trusting relationship between Guidi and Mr. Thiel, on which MKA depended and used to its benefit"; and the loss of an elderly investor's retirement savings was a foreseeable consequence of the risky nature of investing in Qualified Fund.  Furthermore, MKA's conduct was closely related to Norman's harm because, as the trial court found, "[p]resumably," MKA would not have accepted Norman's investment if it had properly monitored Guidi's conduct and "better reviewed the investment file" which raised red flags about whether Norman met the requirements to participate in the private placement offering.

As the trial court also found, MKA was worthy of moral blame: "MKA turned a blind eye to how investors qualify to invest in their ventures when seeking funding; MKA's aim was to accumulate sufficient funding for its real estate investment. Therefore, speculators like MKA have a perverse incentive to ignore how their investors qualify at the time the money comes in, but insist upon enforcement of their investor guidelines when those investors assert their rights."  Finally, imposing a duty under these circumstances was also consistent with public policy discouraging financial elder abuse.

In *Bily*, *supra*, 3 Cal.4th 370, our Supreme Court identified three circumstances which weigh against finding a duty of care among commercial actors who are not in privity of contact:  (1) when recognizing a duty imposes liability out of proportion to fault; (2) when the third party is a sophisticated actor; and (3) when expanding liability

19

could have deleterious effects on the economy.  (*Id.* at pp. 398-408.)  None of these concerns are present here.  As the trial court found, this case involves a discrete situation in which MKA's agent abused his position of trust to unduly and fraudulently influence an elderly unsophisticated client.  Recognizing MKA's duty here does not expose it to liability disproportionate to its fault.  Nor does it imperil the economy.

In its reply brief, MKA argues, for the first time, that it owed Norman only a "general duty of care" to provide accurate disclosure materials regarding the risks of investing in Qualified Fund, citing Corporations Code section 25400 et seq.  We disagree.  These provisions form a part of the Corporate Securities Law of 1968, which "created an entirely new area of statutory liability dealing with fraudulent practices in securities transactions.  [Citations.]"  (*Bowden v. Robinson* (1977) 67 Cal.App.3d 705, 711.)  By enacting this law, the Legislature "established a carefully drafted series of actions and remedies that *supplement common law actions, remedies and limitations*."  (*Id.* at p. 717, italics added.)  Thus, we reject MKA's belated and unsupportable notion that this state securities law statute restricts the scope of its common law duty of care.

In addition to meeting the *Biakanja* test, recognizing a duty of care under these circumstances is also supported by applicable federal securities law.  Although MKA and Norman were not in privity of contract until after Norman made his 2007 investment, MKA's transaction with Norman was regulated by a federal statute.  Section 5 of the Securities Act of 1932 prohibits "the unregistered offer or sale of securities in interstate commerce, unless an exemption from registration applies.  [Citation.]"  (*SEC v. Capital Cove Bancorp LLC* (C.D.Cal. Sept. 1, 2015, No. SACV 15-980-JLS) 2015 U.S. Dist. Lexis 174962, at *24; see 15 U.S.C. § 77e(a), (c).)  Exemptions from registration requirements are construed in light of the statutory purpose of the Securities Act, which is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions."  (*S. E. C. v. Ralston Purina Co*. (1953) 346 U.S. 119, 124, fn. omitted.)  The entity claiming the exemption carries the ultimate burden of proving the exemption applies.  (*Id*. at p. 126; *S. E. C. v. Garber* (S.D.N.Y. 2014) 990 F.Supp.2d 462, 466.)

20

Here, defense witnesses testified that the Qualified Fund offering was exempt from registration requirements of the Securities Act under Regulation D. Regulation D is comprised of three rules which establish different exemptions, and several other rules which impose general conditions for maintaining those exemptions. (See generally Hazen, The Law of Securities Regulation (2009 6th ed.) § 4.20, pp. 186-193; Loss, Seligman, Paredes, Securities Regulation (2015 5th ed.) ch. 3, pp. 356-370.) Defense expert DuFauchard testified that Qualified Fund's private placement was a Rule 506 offering. " 'The SEC promulgated Rule 506 . . . in order to provide investors with a safe harbor to be certain that they can avoid registration requirements.' [Citation.]" (*SEC v. Credit First Fund, LP* (C.D.Cal. Feb. 13, 2006, No. CV05-8741-DSF) 2006 U.S. Dist. Lexis 96697 at *39, fn. omitted.)

In 2007, Rule 506 imposed specific conditions which limited the number of unaccredited investors that could participate in the offering, and which also required that even unaccredited investors had to possess a minimal level of knowledge in financial matters to be able to evaluate the merits and risk of the prospective investment. A minor or technical violation of these requirements could be excused if the issuer could show that it took reasonable steps to comply with them. (17 C.F.R. § 230.506; *Mark v. FSC Securities Corp.* (6th Circ. 1989) 870 F.2d 331, 334-335; Hazen, *supra*, The Law of Securities Regulation, pp. 292-293.)

Our brief overview of these provisions of federal securities law reveals two important fact-based conclusions. First, contrary to MKA's representations, the conditions associated with its Regulation D exemption were not mandatory; MKA voluntarily elected to pursue an exemption in order to avoid registration requirements otherwise imposed by federal law for the protection of its investors. Second, to the extent that the investment relationship between MKA and Norman was dependent on the Regulation D exemption, MKA assumed a statutory duty to take reasonable steps to assure that Norman was an accredited investor.

These conclusions are important because they demonstrate that MKA could not shield itself from liability arising out of the duty it owed to Norman by using an agent or

21

independent contractor to secure investors for the private placement offering. A nondelegable duty may arise when a statute or regulation requires specific safeguards or precautions to ensure others' safety. (*Felmlee v. Falcon Cable TV* (1995) 36 Cal.App.4th 1032, 1038.) Restatement Second of Torts, section 424, states the nondelegable duty rule as follows: "One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions."

"A nondelegable duty is a definite affirmative duty the law imposes on one by reason of his or her relationship with others. One cannot escape this duty by entrusting it to an independent contractor. [Citation.]" (*Felmlee*, *supra*, 36 Cal.App.4th at p. 1038.)

*Camacho v. Youde* (1979) 95 Cal.App.3d 161, illustrates this doctrine. In *Camacho* the court held that the holder of an agricultural pest control license was subject to discipline because his pilot negligently dumped pesticide on a man during aerial spraying of a field. While the court described the pilot as the licensee's employee, it also accurately stated that effective regulation would be impossible if a licensee could immunize himself from disciplinary action by contracting away the daily operations of his business to independent contractors. (*Id.* at p. 164.) The court viewed the licensee's duty to apply pesticides safely as "nondelegable to either an independent contractor or to an employee," and held the licensee "to the conduct prescribed by statute for operating his licensed business." (*Id.* at p. 165.)

Other courts have confirmed the principle under California law that the duty to comply with a statutory or regulatory safeguard is a nondelegable duty. (*Evard v. Southern California Edison* (2007) 153 Cal.App.4th 137, 146-147; see also 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1247, pp. 634-635.)

### 2. Breach

The trial court found that MKA breached its duty to use due care by failing to take reasonable steps to ensure that Norman was an accredited investor. Specifically, MKA

22

did not monitor the conduct of its agent or conduct a reasonable review of Norman's investor file. These findings are supported by substantial evidence.

The record contains two fundamentally different versions of a New Account Application for Norman, both of which were signed by Guidi within a five-week period in 2007. Even a cursory comparison of the two documents would have sent up red flags: (1) Both were signed by Norman and yet they were completed by different people; (2) Both reported that Norman's investment goal was "conservative for income," but they were used to justify an investment that was far from conservative; (3) Although the second form was signed only 33 days after the first, that second form showed Norman's net worth to have significantly increased from that shown on the first form—an amount that disqualified him for MKA's private placement—to an amount that qualified him for that investment.

Other significant discrepancies pertained to information about Norman's advanced age and vulnerability: The May 30 application reported Norman was retired, his IRA account was the source of his investment, and the source of his $800,000 net worth was a "Lifetime of Accumulation." By contrast, the July 2 application stated that Norman was employed, his career was in "Engineering," his source of funds was an "IRA maturing note," and his net worth was $1.067 million.

The other form Norman signed contemporaneously with his 2007 investment in MKA was also a red flag to anyone who read it. Guidi had Norman sign the form to acknowledge he was ignoring advice not to make an investment of more than 20 percent of his net worth, but then filled in blanks on the form to indicate that the MKA investment did not exceed 20 percent of Norman's net worth. As the trial court found, the contradictory information contained on this one form showed that Guidi knew that Norman's net worth was less than the reported amount.

On appeal, MKA contends a breach of duty cannot be based on evidence that it failed to oversee "the conduct of the hundreds of registered representatives of the dozens of . . . broker-dealers who offer the MKA fund to investors." This argument mischaracterizes the narrow scope of the trial court's findings of fact. MKA did not

breach some broad duty to oversee broker-dealers generally, but a specific duty to exercise reasonable care to protect this elderly investor from fraud and other intentional misconduct by appropriately monitoring the individualized transactional actions of its agent, taken for its financial benefit. MKA also breached its duty by failing to review documents in its own file that were generated for the express purpose of assisting it in determining whether to accept a proposed investment.

MKA argues that DuFauchard's "uncontradicted expert testimony" establishes that MKA had no duty to verify independently information about Norman gathered by Guidi. DuFauchard testified it is industry practice for the private placement issuer to delegate responsibility to the broker-dealer to "scrub" the potential investor to make sure he or she is eligible to make the investment. However, he also acknowledged that if the broker-dealer fails to comply with pertinent securities laws governing the private placement offering, the failure creates potential liability for both the broker-dealer and the issuer.

Furthermore, DuFauchard did not testify it is standard industry practice for an issuer to fail to review a potential investor's file before accepting his or her investment. To the contrary, MKA's general counsel, Daniel White, testified that if paperwork associated with a new investment disclosed the investor sought a "conservative for income" investment, or if there was some other "red flag" in the file, MKA would return the investment. In this case, however, MKA did not follow *its own* standard practice.

We also reject MKA's contention there is no evidence MKA's file for Norman contained documents generated by ePlanning that could potentially have disclosed Guidi's fraud and/or the fact that Norman was not an accredited investor. The trial court made an express finding that "MKA held a complete file on Mr. Thiel that contained all relevant documents associated with this investment." This finding is supported by the trial testimony of Daniel White, which we have summarized above.

### 3. *Statute of Limitations*

MKA next contends that Norman's claim against MKA for negligence is barred by the two-year statute of limitations. (Code Civ. Proc., § 339, subd. 1.) MKA relies on trial testimony from Advisors's executive vice-president of finance, Brian Wagoner, that

24

"somewhere in January 2008 I believe we sent out a letter to all the investors explaining that there's a problem and we're going to do a I think like a one or two quarter pause in paying monthly distributions." According to MKA, this testimony shows that Norman was "on notice that he was not in a conservative investment when [Qualified] Fund stopped paying distributions in January 2008." We disagree. The explanation Advisors gave to Qualified Fund inventors did not put them on notice of anything except that there was an unexpected, temporary pause in paying monthly distributions.

Alternatively, MKA asserts that the two-year statute of limitations began to run in August 2008 when "the Thiels were communicating with other investors in the MKA Fund regarding their concerns about the fund." To support this theory, MKA relies on testimony by Gae and Laura which shows that, as early as August 2008, a disgruntled MKA investor contacted Gae by e-mail and opined that MKA was a Ponzi scheme, and that Gae expressed an interest in learning about his lawsuit. But, this evidence is not probative on the statute of limitations defense because the causes of action that resulted in this judgment belonged to Norman, not to Gae. Indeed, the trial testimony upon which MKA relies shows that Norman did not participate in any of Gae's email communications with the disgruntled MKA investor. MKA does not identify any evidence that Norman was even aware of that investor. To the contrary, Laura testified that Norman did not suspect MKA of any wrongdoing until he learned that Guidi was arrested. Thus, the trial record supports the court's express finding that Norman did not understand the nature of his claims until he learned that Guidi was arrested for fraud.

As best we can determine, the trial evidence does not fix the exact date Norman learned about Guidi's arrest, which appears to have occurred on May 21, 2009. As discussed above, the demand letter from Norman's attorney which referred to that fact was dated June 9, 2009. Therefore, the statutes of limitations on Norman's claims began to run no earlier than May 21, 2009. Norman filed his original complaint less than two years later, on September 10, 2010, well within the two-year limitations period. Thus, MKA failed to establish its statute of limitations defense.

25

**B. MKA's Vicarious Liability**

MKA challenges parts of the judgment holding it vicariously liable for Guidi's fraud, breach of fiduciary duty and elder abuse. The crux of these arguments is that MKA and Guidi were not in an agency relationship "as a matter of law" because "ePlanning was an independent contractor, and Guidi worked under ePlanning's auspices."

### *1. The Agency Finding Is Supported By Substantial Evidence*

"An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." (Civ. Code, § 2295.) "An agent for a particular act or transaction is called a special agent. All others are general agents." (Civ. Code, § 2297.) "An agency relationship 'may be implied based on conduct and circumstances.' [Citation.]" (*Borders Online v. State Bd. of Equalization* (2005) 129 Cal.App.4th 1179, 1189.)

" ' "[T]he existence of an agency relationship is usually a question of fact, unless the evidence is susceptible of but a single inference.' " ' [Citation.]" (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 214.) Where conflicting inferences may reasonably be drawn from the evidence, the determination of the trial court will be accepted on review even though a contrary determination could likewise have been upheld. (3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 93, p. 140; *Trane Co. v. Gilbert* (1968) 267 Cal.App.2d 720, 726 ["The question of whether one is an agent is ordinarily a question of fact, the determination of which by the trial court on substantial evidence will be binding on the reviewing tribunal."]; *McCollum v. Friendly Hills Travel Center* (1985) 172 Cal.App.3d 83, 91 [existence of an agency relationship is a jury question " 'unless the evidence is susceptible of but a single inference' "].)

It has been said that " ' "the chief characteristic" ' " of an agency relationship " ' "is that of representation, the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties. [Citations.]" [Citation.]' " (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 620.) In this case, the record

contains substantial evidence that MKA retained ePlanning (and Guidi) to act for and in the place of MKA in order to bring MKA into legal relations with third party investors in MKA's Qualified Fund. That evidence falls into three main categories.

First, as MKA's trial expert testified, in order to offer securities pursuant to a private placement, MKA had to comply with the requirements of the exemption that it invoked. Because one such requirement precluded MKA from making a general solicitation for investors, MKA chose to use a representative—in this case ePlanning—to act on its behalf in order to secure offers for its private placement. Specifically, when Guidi elicited Norman's legally binding offer to invest in the Qualified Fund, Guidi was acting for and in the place of MKA in order to bring about a legal relationship between Norman and MKA, a relationship that could not have been created without Guidi's representation because MKA did not have its own prior relationship with Norman.

Second, MKA witnesses also testified that MKA operated under an exemption which required it to secure only accredited investors. As discussed above, MKA had a statutory duty to ensure that Norman was such an investor. The evidence in this case shows that MKA attempted to comply with that duty by using a representative to ensure in the first instance that investment offers were solicited only from accredited investors.

Finally, as the trial court found, MKA and ePlanning manifested their intent to create an agency relationship by entering into the 2006 PAA. Through execution of that contract, MKA engaged ePlanning to "serve as a non-exclusive broker and placement agent for the offering and sale of Units in the Fund," and ePlanning agreed to "perform its obligations under [the PAA] through its registered representatives." While these contract provisions are not dispositive of an agency relationship, evidence that the parties believed they were creating a relationship in which ePlanning would act as a representative of MKA for the purpose of securing offers to invest in the Qualified Fund was relevant to establish that an agency was in fact created. (See, e.g., *ING Bank, FSB v. Chang Seob Ahn* (2010) 758 F.Supp.2d 936, 942 (ING) [under California law, evidence that parties included a provision in their contract disclaiming an agency relationship was relevant to question whether agency existed.])

27

On appeal, MKA does not dispute that ePlanning acted as its representative by securing offers to invest in the Qualified Fund. Instead, MKA contends that, as a matter of law, ePlanning performed services for MKA solely in its capacity as an independent contractor.

MKA's characterization of ePlanning as an independent contractor is consistent with a provision in the 2006 PAA that states: "It is understood that the Broker's relationship with MKA is as an independent contractor. Nothing herein shall be construed as creating a relationship of partners, joint venturers, or employer and employee between or among the Broker or MKA." However, MKA overlooks the fact that neither this provision, nor any other evidence in this record precluded the trier of fact from finding that ePlanning was *also* an agent of MKA for the offering and sale of units in the MKA fund. Indeed, that is precisely how the parties described ePlanning in the 2006 PAA.

Under California agency law, there is no question that an independent contractor can also be an agent. "Agency and independent contractorship are not necessarily mutually exclusive legal categories as independent contractor and servant or employee are. In other words, an agent may also be an independent contractor. [Citation.] One who contracts to act on behalf of another and subject to the other's control, except with respect to his physical conduct, is both an agent and an independent contractor. [Citation.]" (*City of Los Angeles v. Meyers Bros. Parking System, Inc.* (1975) 54 Cal.App.3d 135, 138, italics omitted; see also *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 46, fn. 4 [confirming that "if a person contracts to act on behalf of another (the principal) and subject to the principal's control except with respect to physical conduct, that person is both an agent and an independent contractor"], italics omitted; *Jackson v. AEG Live, LLC* (2015) 233 Cal.App.4th 1156, 1184 (*Jackson*) [same].)

These cases are based on the Restatement Second of Agency, which provides the following definition of an independent contractor: "a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the

28

undertaking. He may or may not be an agent." (Rest.2d Agency, § 2.) The Restatement Second of Agency also expressly states that "One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor." (*Id*. at § 14N.)

In the present case, the factual evidence shows that ePlanning contracted to act on behalf of MKA and subject to its control except with respect to the physical conduct of its employees and representatives. Through the contractual duties that ePlanning undertook, MKA controlled to a large degree the interactions that ePlanning registered representatives were to have with prospective investors in Qualified Fund. Those contract terms dictated, for example, who could invest, what material would be provided to potential investors, what records ePlanning was required to keep; how ePlanning representatives were to interact with clients; what actions by ePlanning representatives required MKA's express prior approval; and what provisions of the securities law governed the transactions.

Furthermore, in drafting the 2006 PAA, MKA reserved specific duties which ensured its ultimate control over the investment transaction. As noted in our factual summary, MKA retained responsibility for reviewing each Purchaser Questionnaire and used that information to exercise its sole discretion to decide "whether to accept the an offer to invest." This retention of ultimate control over the investment transaction dovetailed with ePlanning's contractual obligation to represent MKA; ePlanning acted for and on behalf of MKA by securing investors that were not otherwise available to MKA, and MKA controlled that representation by retaining the authority to decide whether to accept the offers that ePlanning secured on its behalf.

For all of these reasons, we conclude that even if we assume ePlanning was an independent contractor, the trial record contains substantial evidence to support the agency finding in this case. We reach this conclusion paying more than lip service to our standard of review of this issue, and will not parse the factual record for evidence that might lead to a contrary conclusion. We also emphasize the discrete nature of the trial court's finding. The court did not find that ePlanning was a general agent or employee of

MKA, but rather that it acted as a special agent of MKA when it solicited and secured offers to invest in Qualified Fund.

### 2. Complete Control Is Not Required

MKA insists that an independent contractor cannot be an agent of the hirer unless the hirer "exerts almost complete control" over the independent contractor, citing *Stilson v. Moulton-Niguel Water Dist.* (1971) 21 Cal.App.3d 928, 936 (*Stilson*).

In *Stilson*, *supra,* 21 Cal.App.3d 928, the plaintiff was injured during the course of his employment by American Bridge, a contractor that was hired by a water district to construct water tanks. The trial court entered a directed liability verdict against the water district finding it was vicariously liable for appellant's injuries because American Bridge was its employee/agent. On appeal, the *Stilson* court found the directed verdict could not be sustained on the basis of agency, but affirmed the judgment on the ground that the water district violated a nondelegable duty to take precautions to avoid the risk that caused plaintiff's injury.

Preliminarily, we recognize that *Stilson* addressed a substantively different agency question. The issue in *Stilson* was whether American Bridge was an employee *or* an independent contractor of the hirer. (*Stilson, supra,* 21 Cal.App.3d at p. 935.) As noted above, it is not possible to be both an employee and an independent contractor. (See generally *Gonzalez v. Workers' Comp. Appeals Bd.* (1996) 46 Cal.App.4th 1584, 1589-1593.) But that is not the question we address here. The issue before us is whether substantial evidence supports a finding that ePlanning was an agent of MKA regardless of whether it was also an independent contractor.

As to the control issue, the actual rule quoted in *Stilson* is that " 'If the employer has the right to exercise complete control, an employer-employee relationship exists, whether or not that potential control is exercised with respect to all details.' [Citation.]" (*Stilson, supra*, 46 Cal.App.4th at p. 936.) This rule does not mean that an agency finding must be supported by proof that the hirer had the right to exercise complete control. (*Wickham v. Southland* (1985) 168 Cal.App.3d 49, 58.) Rather, it means that when there is proof of "the right to exercise complete control a principal-agency

30

relationship exist[s] as a matter of law, but that otherwise the right to control [is] an important factor to be taken into consideration" along with numerous other potentially relevant factors. (*Ibid.*)

" '[W]hether an agency relationship has been created or exists is determined by the relation of the parties as they in fact exist by agreement or acts [citation], and the primary right of control is particularly persuasive. [Citations.] Other factors may be considered to determine if an independent contractor is acting as an agent, including: whether the "principal" and "agent" are engaged in distinct occupations; the skill required to perform the "agent's" work; whether the "principal" or "agent" supplies the workplace and tools; the length of time for completion; whether the work is part of the "principal's" regular business; and whether the parties intended to create an agent/principal relationship. [Citation.]' [Citation.]" (*Jackson*, *supra*, 233 Cal.App.4th at p. 1184.)

Here, as discussed above, there is substantial evidence of MKA's right to control ePlanning's conduct with respect to the acquisition of investors for MKA's private placement. Other pertinent factors were also present. In this instance, ePlanning was engaged to perform a role that belonged to MKA, i.e., to secure investors for MKA's private placement, and to take steps to ensure those investors were accredited. That work was part of MKA's regular business, and, by executing the 2006 PAA, the parties manifested the intent to create an agent/principal relationship in which ePlanning's registered representatives would act on MKA's behalf by arranging for accredited investors to make offers to purchase units in the Qualified Fund.

Despite its different context, *Stilson* offers comments on several general points of agency law that are supportive of the conclusion the trial court, and we, reach in this case. First, echoing the passage in *Jackson* we quote above, *Stilson* confirms that in cases involving alleged employer-employee relationships, control is but one of "numerous" factors to be considered. (*Stilson*, *supra*, 21 Cal.App.3d at p. 936.) Second, *Stilson* mentions the significance of whether the parties intended to create an agency relationship. (*Id*. at p. 937.) Thus, under *Stilson*, the fact that MKA and ePlanning

31

expressed their intention to create an agency relationship in the 2006 PAA properly was supportive of the trial court's finding of agency in this case.

Finally, the most relevant aspect of *Stilson* is its disposition, which exemplifies exactly why agency is ordinarily a question of fact. Even when the circumstances are undisputed, the totality of the evidence may be susceptible to more than one reasonable inference depending on a multitude of potentially relevant factors. The *Stilson* judgment was reversed because the trier of fact was denied the opportunity to perform its function of deciding whether to draw a reasonable inference that an agency relationship existed in that case. (*Stilson*, *supra*, 21 Cal.App.3d at p. 937.)

That error did not occur here; in this case, the agency issue was the subject of a trial and a finding based on evidence produced during that trial. Indeed, the *Stilson* court emphasized that the existence of an agency relationship "is normally a question of fact." (21 Cal.3d at p. 936.) Because the agency finding in this case is supported by the trial record, MKA's appeal of this issue is not well-founded.

### 3. Control Over Day-to-Day Matters Is Not Required

MKA argues that, as a matter of law, ePlanning was not its agent because MKA did not control "day-to-day matters" relating to ePlanning's employees, citing *Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474 (*Patterson*). MKA characterizes *Patterson* as directly relevant precedent which *bars* an agency finding in this case.

In *Patterson, supra,* 60 Cal.4th 474, the plaintiff alleged that she was subjected to sexual harassment by her supervisor at a pizza franchise where both were employed. Plaintiff sued her alleged harasser, the franchisee of the pizza store, and the franchisor. The trial court granted the franchisor summary judgment, but the court of appeal reversed the judgment. The issue before the Supreme Court was whether "a franchisor stand[s] in an employment or agency relationship with the franchisee and its employees for purposes of holding it vicariously liable for workplace injuries allegedly inflicted by one employee of a franchisee while supervising another employee of the franchisee[.]" (*Patterson*, *supra*, 60 Cal.4th at pp. 477-478.)

The *Patterson* court's agency analysis focused on two primary factors: (1) the level of control the franchisor exercised over the franchisee; and (2) the need to ensure that any extension of vicarious liability was consistent with the "contemporary realities" of the franchise industry. (*Patterson*, *supra*, 60 Cal.4th at p. 478.) The plaintiff's theory was that "the degree of control exercised by franchisors like Domino's makes each franchisee the agent of the franchisor *for all business purposes*, and renders each employee of the franchisee an employee of the franchisor in vicarious liability terms." (*Id*. at p. 496, italics added, fn. omitted.) Rejecting this theory, the *Patterson* court found that, to the extent a franchisor "imposes comprehensive and meticulous standards for marketing its trademarked brand and operating its franchises in a uniform way," the franchisor "controls the enterprise." (*Id*. at p. 478.) But for the franchisor to incur liability for the conduct of employees of franchisees who injure each other on the job, the franchisor must function more like an employer itself by retaining or assuming "a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees. [Citation.]" (*Id*. at p. 478.)

Applying the principals set forth above, the *Patterson* court concluded the franchisor was entitled to summary judgment with respect to plaintiff's sexual harassment claims because the undisputed evidence established that while the franchisor controlled the business operations and brand image of the pizza store, the franchisee "made day-to-day decisions involving the hiring, supervision, and disciplining of his employees." (*Patterson, supra*, 60 Cal.4th at p. 478.)

Contrary to MKA's contention on appeal, *Patterson* does not hold that "day-to-day control" is the standard for establishing *any* agency relationship. Rather, the *Patterson* court addressed the "novel" question of a franchisor's vicarious liability for workplace injuries allegedly inflicted and suffered by employees of a franchisee, and it explicitly limited its holding to that context. (*Patterson*, *supra,* 60 Cal.4th at pp. 477, 503.) The present case does not involve a franchise agreement or a work place injury involving employees of a franchisee.

33

Equally important, the issue here is not whether ePlanning was an agent of MKA for all business purposes.  (Compare *Patterson, supra*, 60 Cal.4th at p. 496.)  Rather, the pertinent issue is whether ePlanning was acting as an agent of MKA when its representatives interacted with third parties for the purpose of securing investors for MKA's company.  Evidence that MKA used entities like ePlanning to conduct those interactions in order to qualify for a federal securities law exemption, and that MKA controlled the nature of those dealings through its "Placement *Agent* Agreement" (italics added) supports the trial court's factual conclusion that an agency relationship existed for that specific purpose.

### 4.  *ePlanning Was Not An Insurance Broker*

MKA contends that this case is analogous to insurance coverage cases in which courts have found that an insurance broker who procures a policy for the insured is not acting as the agent of the insurance provider.  (See, e.g., *American Way Cellular, Inc. v. Travelers Property Casualty Co. of America* (2013) 216 Cal.App.4th 1040; *Rios v. Scottsdale Ins. Co.* (2004) 119 Cal.App.4th 1020, 1026 (*Rios*).)

Agency relationships pertaining to the transaction of insurance are governed by the Insurance Code.  (See *Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 928 [the "evolution of the concepts of broker and agent in the insurance context" parallel an "extensive statutory history"].)  The Insurance Code defines an "Insurance agent" as "a person authorized, by and on behalf of an insurer, to transact all classes of insurance other than life, disability, or health insurance, *on behalf of an admitted insurance company*."  (Ins. Code, § 31, italics added.)  An "Insurance broker" is defined as "a person who, for compensation and on behalf of another person, transacts insurance other than life, disability, or health with, *but not on behalf of, an insurer*."  (Ins. Code, § 33, italics added.)  By their express terms, these definitions do not apply outside the insurance industry.

Furthermore, even in the insurance context, an individual's designation as an agent or broker is not necessarily determinative.  "Generally, an insurance agent acts only as the agent for the insured in procuring a policy of insurance.  [Citation.]  An insurance

34

broker may, however, act in a dual capacity, in which he serves as the insured's broker in procuring insurance but also acts as the insurer's agent by collecting the premium and delivering the policy to the insured. [Citations.]" (*Mark Tanner Construction, Inc. v. HUB Internat. Ins. Services, Inc.* (2014) 224 Cal.App.4th 574, 584, italics omitted.) When a dual agency issue arises, courts look to the facts of the particular case, what the parties said and did, to determine whether there was an actual agency relationship. (*Maloney v. Rhode Island Ins. Co.* (1993) 115 Cal.App.2d 238, 244-245.)

For example, in *Rios*, *supra*, 119 Cal.App.4th 1020, a jewelry store owner sued her insurer for denying her claim for losses relating to a theft at her store. The *Rios* court affirmed a defense summary judgment, finding that the plaintiff's policy did not cover theft and that any erroneous representation about the scope of that coverage made to plaintiff by an insurance broker could not be imputed to the insurer. (*Id.* at p. 1023.) In analyzing the agency issue, the court explained that the plaintiff's insurance policy had been procured by an individual named Whilt who acted as both a broker and an agent of the insurance company. With regard to the procurement of the policy, Whilt was the plaintiff's agent because he acted as an insurance broker with no authority to bind the insurer. For other limited purposes, such as receiving premiums, Whilt was an agent of the insurance company. Because Whilt was only a limited agent with no binding authority, he was not a "general agent" of the insurer as a matter of law. (*Id.* at p. 1027.)

As our discussion above makes plain, the issue in this case is not whether ePlanning was MKA's general agent. Thus, ePlanning's lack of authority to bind MKA is not dispositive here, as it can be in insurance coverage cases.[8] Furthermore, the

---

[8] To put the matter in general agency terms, lack of authority to enter into a binding contract on behalf of the principal pertains to the scope of an agency, not to the determination of whether an agency exists. (Rest.3d Agency, § 1.01., com c ["Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf."].) For example, in *Mason v. Mazel* (1947) 82 Cal.App.2d 769, plaintiffs sought specific performance of a real estate purchase agreement that was executed for the defendant by a third party. The court denied specific performance because it found that the third party *was an agent*

35

function that ePlanning performed with respect to the Qualified Fund private placement was not equivalent to an insurance broker whose role is limited to finding insurance coverage for its client. Here, the evidence shows that MKA chose to conduct a private placement offering, and it also chose to retain ePlanning to act on its behalf and in its place in order to locate and solicit offers from accredited investors who were not otherwise available to MKA. This and other evidence discussed above supports the trial court's factual conclusion that ePlanning was MKA's agent in that specific context.

### 5. Compliance with the Securities Law Does Not Preclude An Agency Finding

MKA argues that when an issuer of a private placement simply follows industry practice by including "securities law-driven requirements" in a placement agent agreement, it is not exerting the type of independent control required to justify finding an agency relationship. For this reason, MKA contends, this court should follow the lead of courts outside this jurisdiction which have "uniformly" held that "a private-placement entity is not vicariously liable on an agency theory for misrepresentations made by independent-contractor 'placement agent' brokers or their registered representatives."

Characterizing the restrictions MKA imposed on ePlanning as "securities law-driven requirements" is misleading. The provisions in the 2006 PAA that controlled the conduct of ePlanning's registered representatives pertained to an exemption from a registration requirement that MKA chose to pursue and sought to maintain for its own financial benefit. Because MKA wanted that exemption from registration, it had to meet certain requirements, and by executing the 2006 PAA, it delegated some of that work to an agent, ePlanning.

Furthermore, for all the reasons discussed above, we are not persuaded by MKA's argument that a broker-dealer of a private placement offering can never be the agent of the issuing company, as a matter of law. The finding of an agency relationship in this case is not only supported by substantial evidence, but is consistent with California law.

---

authorized to act on the defendant's behalf in order to find a purchaser but *was not an agent* for purposes of consummating an actual sale of the property. (*Id*. at p. 773.)

36

MKA fails to provide any California authority supporting the per se rule that it proposes. The contention that courts outside this jurisdiction have settled the matter has inadequate and inapposite support—MKA cite only two cases: *Schweizer v. Keating* (D. Md. 2001) 150 F.Supp.2d 830 (*Schweizer*), and *Brooks v. Euclid Sys. Corp.* (2003) 151 Md.App. 487, which followed *Schweizer*. Both cases were decided under Maryland law and involved plaintiffs who took investment advice from Michael Keating. Resort to these out-of-state cases is unnecessary because the issues on appeal are readily resolved by applying California agency law to the evidence produced at trial. We note also that the 2006 PAA contains a choice of law provision under which the parties agreed that California law would apply to the interpretation of the 2006 PAA and the rights and duties of the parties thereunder. In any event, the two Keating cases relied on by MKA are inapposite.

In *Schweizer*, *supra*, 150 F.Supp.2d 830, a 57-year-old businessman with an annual income of more than $400,000 sought damages resulting from his investments in a business trust operated by its managing shareholder Ridgewood Power Corporation. The plaintiff had been paid distributions which represented an annual rate of return of approximately seven percent, but when he was unable to liquidate his investments he filed suit against Keating, Keating's broker-dealer employer (Delta), and Ridgewood. The Plaintiff alleged that Ridgewood was directly liable for fraud, securities law violations and negligence, and that it was also vicariously liable for Keating's misconduct. The trial court granted Ridgewood summary judgment and the *Schweizer* court affirmed. (*Id*. at p. 837.)

First, the *Schweizer* court rejected the plaintiff's argument that Ridgewood was directly liable for failing to advise him that the shares he purchased were speculative and illiquid, finding that the summary judgment evidence established that Ridgewood "undertook extensive measures designed to ensure that prospective investors would be aware that the Trust shares were both speculative and illiquid." (*Schweizer*, *supra*, 150 F.Supp.2d at pp. 838-839.) Then, the court turned to the plaintiff's theory of vicarious liability which was premised on the allegation that Ridgewood was Keating's employer.

37

(*Id*. at p. 839.)  The court affirmed the summary judgment ruling as to this theory because the evidence established the following facts:  Delta was Keating's employer; Ridgewood's written contract with Delta contained an express "disavowal of a[n] employee-employer relationship"; and there was insufficient evidence regarding the parties' acts and conduct to support an inference of an employer-employee relationship under Maryland law.  (*Id.* at pp. 839-840.)

In reaching its decision, the *Schweizer* court rejected the plaintiff's contention that an "employer-employee relationship" was created by provisions in the Ridgewood-Delta contract which gave Ridgewood the right to control the manner in which the investment was offered to potential investors.  (*Schweizer*, *supra*, 150 F.Supp.2d at p. 840.)  The court reasoned that "[m]ost of the 'control' provisions identified by Plaintiff [were] identical to those imposed under the applicable securities laws, and enable[d] the offering to retain exemption from registration."  (*Ibid*.)  Absent evidence that those restrictions were atypical, or that Delta was deprived of its discretion regarding who to choose as or how to interact with investment clients, the contract did not establish a basis for plaintiff's allegation of a "master-servant relationship."  Nor did plaintiff identify any other indicia of an employer-employee relationship between Ridgewood and Delta or Keating.  Finally, because the allegation that Ridgewood controlled Delta's conduct was "baseless," the court summarily concluded the plaintiff could not prove an actual agency by inference under Maryland law.  (*Id*. at p. 841.)

In this court, MKA contends its 2006 PAA with ePlanning is indistinguishable from the *Schweizer* agreement, the *Schweizer* court's reasoning is unassailable, and, therefore, *Schweizer* compels the conclusion that ePlanning was not MKA's agent as a matter of law.

*Schweizer*, *supra*, 150 F.Supp.2d at page 839, is distinguishable on several grounds.  In that case, Ridgewood's contract with Delta expressly stated that Delta was an independent contractor "and that nothing herein shall be construed as creating a relationship of partners, affiliates, joint venturers, or employer and employee . . . ."  Despite that express contract term, the plaintiff's theory was that the broker-dealer was

38

actually an employee. Because there was no evidence to support that theory, summary judgment was affirmed. This case presents a fundamentally different legal issue than *Schweizer* addressed, i.e., whether ePlanning was an agent, not whether it was an employee of MKA. Furthermore, although the 2006 PAA characterized ePlanning as an independent contractor, that placement *agent* agreement also expressly characterized ePlanning as an "agent" of MKA. As noted earlier, California common law specifically provides that an agency relationship can be found even where the agent is an independent contractor. (*Doctors' Co. v. Superior Court*, *supra*, 49 Cal.3d at p. 46.) As also noted, evidence the parties believed they were creating an agency relationship is a relevant factor particularly when, as here, that belief is expressed in the contract itself. (*ING*, *supra*, 758 F.Supp.2d at p. 941, quoting *Stilson*, *supra*, 21 Cal.App.3d at p. 937.)

Also, we disagree with MKA that the reasoning of *Schweizer* is unassailable. For example, the *Schweizer* court disregarded the fact that the Ridgewood-Delta agreement allowed Ridgewood to retain control over the manner in which trust shares would be offered to potential investors solely because those "control" provisions were designed to enable the offering to retain an exemption from registration. (*Schweizer*, *supra*, 150 F.Supp.2d at p. 840.) But the court failed to explain why compliance with the securities laws was inconsistent with an agency finding. As discussed above, evidence that a private placement issuer made the decision to use a broker to solicit offers on its behalf in order to maintain its own exemption from securities law registration requirements supports the agency finding. Indeed, without a broker to represent the issuer and act on its behalf, a legal relationship with a third party investor would typically not otherwise occur.

Finally, in *Schweizer*, *supra*, 150 F.Supp.2d 830, the district court found the summary judgment evidence was insufficient to create a triable issue of fact as to whether a employer-employee relationship existed between a private placement issuer and a broker dealer. Here, by contrast, we sit as a court of review to determine whether an express finding of fact is supported by substantial evidence. For all of the reasons

39

discussed above, the agency finding is supported by the trial record in this case. Thus, MKA's nonbinding *foreign* authority does not affect our conclusions outlined above.

## C. MKA's Liability for Elder Abuse

MKA next claims it is not liable for financial elder abuse because (1) there is "no evidence supporting a finding that ePlanning or Guidi was the MKA Defendants' agent" and (2) the trial court did not find that MKA did anything which could support a finding of direct liability under the elder abuse statute. We reject both assertions. As discussed above, substantial evidence supports the agency finding. Furthermore, the trial court did make findings regarding MKA's direct liability for financial elder abuse.

"The Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.) was enacted to provide for the 'private, civil enforcement of laws against elder abuse and neglect' [citation]. The statutory provisions are not limited to mentally incompetent or physically impaired elders, or persons of limited financial means. [Citations.]" (*Bonfigli v. Strachan* (2011) 192 Cal.App.4th 1302, 1315 (*Bonfigli*).)

" 'Financial abuse' of an elder . . . occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70." (Welf. & Inst. Code, § 15610.30, subd. (a).)

"Under the statute, it is not necessary that the taker maintain an intent to defraud if it can be shown that the person took the property for a wrongful use and 'knew or should have known that [his or her] conduct was likely to be harmful to the elder . . . .' [Citations.]" (*Bonfigli*, *supra*, 192 Cal.App.4th at p. 1315.)

Here, as discussed above, the trial court found that MKA was negligent in accepting Norman's investment because it failed to catch "the irregularities contained in

its investor file, and because it did not properly monitor Mr. Guidi as its registered representative." The court also found that after MKA was put on notice that Norman's investment was procured by Guidi's fraud, MKA "retained Mr. Thiel's money," when it "knew or should have known that keeping the money would be harmful to him." MKA overlooks these findings, which are sufficient to hold it directly liable for financial elder abuse.

In its reply brief, MKA argues that refusing to return Norman's investment did not constitute elder abuse as a matter of law. It reasons the recipient of an investment is not required "to return funds to an elder upon demand without a showing that the recipient itself engaged in wrongdoing," and in this case there is no evidence that MKA did anything wrong.

For reasons we have thoroughly discussed, accepting Norman's investment in the first place was wrongful; MKA negligently accepted an investment from an elderly, cognitively impaired retiree who was unduly influence by MKA's agent, who did not meet the requirements of an accredited investor, and who expressly stated in writing that he desired a conservative investment. Furthermore, there is substantial evidence MKA *retained* Norman's property for its own financial benefit when it knew or should have known that the investment was secured by fraud, and it did so with knowledge that its actions would be harmful to Norman. This evidence includes White's testimony which shows that MKA ignored or overlooked evidence in its own file that should have caused it concern; that it did not investigate Norman's claim that his investment was induced by Guidi's fraud; and that it retained a substantial portion of Norman's life savings when it knew that retaining that money would be harmful to Norman.

### D. MKA's Liability for Breach of Fiduciary Duty

MKA does not challenge the trial court's finding that Guidi breached his fiduciary duty to Norman. Thus, we affirm that finding without further discussion. MKA does contend, however, that as "a matter of due process" it cannot be liable for breach of fiduciary duty because Gae's complaint did not name it in the breach of fiduciary cause of action.

41

In her complaint, Gae did not allege that the MKA defendants owed a fiduciary duty to Norman. The complaint did, however, contain specific and detailed agency and co-conspirator allegations which put MKA on notice of its potential liability for damages caused by Guidi's breach of fiduciary duty. In addition, Guidi's breach of fiduciary duty was a component of the separately pled cause of action for financial elder abuse, and MKA was expressly named in the financial elder abuse cause of action. Finally, and in any event, this case was tried on the theory that MKA was vicariously liable for Guidi's breach of fiduciary duty. Thus, MKA waived its claim that the pleadings failed to raise this issue adequately. (*Hilliard v. A. H. Robins Co*. (1983) 148 Cal.App.3d 374, 392.)

### E. Advisors' Liability for Norman's Damages

Because MKA conceded that Qualified Fund is unable to act except through Advisors, the trial court found that Gae did not have to prove Advisors was an alter ego of Qualified Fund in order to hold Advisors liable for Norman's damages. On appeal, MKA disputes this finding, arguing Advisors is essentially an agent of the Fund, and it cannot be personally liable for acts performed on behalf of its principal. We find no evidence Advisors asserted this agency defense at trial. In any event, the record substantially shows that Advisors' direct liability was based on its own duty to Norman and its agency relationship with Guidi.

Alternatively (and inconsistently), Advisors contends Norman was a "complete stranger." But, as the manager of Qualified Fund, Advisors had a duty to ensure the fund's private placement offering complied with the exemption from securities law requirements. The securities law and its exemptions are designed to protect the investor, in this case Norman. Thus, Advisors did owe Norman a duty of care for all of the reasons discussed above.

Finally, MKA contends Advisors cannot be liable for any of Norman's damages because Advisors "wasn't even sued until 2013." As discussed above, Norman filed his original complaint in September 2010, but Advisors was not named as a defendant until November 26, 2013, when Gae filed her operative Third Amended Complaint. MKA

42

posits that "[a]ny two-year statute of limitations, as a matter of law, thus had long run by 2013." In making this argument, MKA fails to acknowledge important procedural facts.

As discussed earlier, the statutes of limitations on Norman's claims began to run no earlier than May 21, 2009. Less than two years later, on April 6, 2011, this case was stayed when Qualified Fund filed an appeal from an order denying its motion to compel arbitration of Norman's claims. (Code Civ. Proc., § 916, subd. (a).) While that appeal was pending, MKA entered into a stipulation with Norman that all statutes of limitations pertaining to any claim Norman had against Advisors were tolled until 45 days "following the filing and service by plaintiff of a Second Amended Complaint." [9] On November 9, 2012, this court affirmed the order denying arbitration. Norman died the following year, and, on October 17, 2013, the trial court granted Gae's motion to file a second amended complaint, substituting herself as Norman's successor in interest. Less than 45 days later, on November 26, 2013, Gae filed her complaint which added Advisors as a named defendant. Since the tolling agreement was still in effect at that time, the claims against Advisors were not barred by the two-year limitations period.

## F. Damages Issues

### 1. Emotional Distress Damages Were Recoverable

As noted above, the trial court awarded Gae $400,000 in emotional distress damages. MKA contends there is no legal basis for that award.[10] We disagree.

Section 377.34 of the Code of Civil Procedure (section 377.34) provides that a successor in interest on the decedent's cause of action may not recover "damages for pain, suffering, or disfigurement." However, section 15657.5 of the Welfare and Institutions Code states that "[w]here it is proven by a preponderance of the evidence that

---

[9] MKA does not dispute its tolling agreement with Norman was valid. (See *Salmon Protection & Watershed Network v. County of Marin* (2012) 205 Cal.App.4th 195, 203 [recognizing the "desirability and validity" of tolling agreements].)

[10] Because MKA did not file a motion for new trial, it may not contend on appeal that the amount of the damages award was excessive. (Code Civ. Proc., § 657, subd. (5); see, e.g., *Sholar v. Barker* (1962) 211 Cal.App.2d 31, 32-33; *Schroeder v. Auto Driveway Co.* (1974) 11 Cal.3d 908, 918.)

43

a defendant is liable for financial abuse, as defined in Section 15610.30, and where it is proven by clear and convincing evidence that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of the abuse, in addition to reasonable attorney's fees and costs set forth in subdivision (a), compensatory damages, and all other remedies otherwise provided by law, the limitations imposed by Section 377.34 of the Code of Civil Procedure on the damages recoverable shall not apply." (Welf. & Inst. Code, § 15657.5, subd. (b).

In this case, the trial court found that MKA was directly and vicariously liable for financial elder abuse. (Welf. & Inst. Code, § 15610.30.) The court also found clear and convincing evidence of fraud, oppression and malice. Taken together, the court's findings establish that the limitation on the recovery of emotional distress damages imposed by section 377.34 does not apply here.

MKA argues that even if section 377.34 does not apply, there was still no basis for awarding emotional distress damages because "economic loss, without more, cannot support an award of emotional distress damages." MKA's only authority for this claim of error is a reference to *Erlich v. Menzes* (1999) 21 Cal.4th 543, 554-555, which applies the general rule that emotional distress damages are not recoverable for negligence resulting in a purely economic injury.

If by this argument, MKA means to say the torts that were committed against Norman did not cause him mental suffering, we disagree. Testimony from Gae and Laura substantially supports the trial court's implicit finding that these wrongful acts caused Norman to suffer mental pain and suffering in addition to his economic injury.

If MKA is arguing that Norman was not entitled to emotional distress damages because he did not incur a physical injury, he is mistaken. " 'Damages for emotional distress have been permitted only where there is some means for assuring the validity of the claim. [Citation.] The case law reveals a diversity of circumstances in which recovery for emotional distress may be had. They are loosely linked in the sense that in each it could be said that a particular form of mental suffering naturally ensued from the acts constituting the invasion of another kind of protected interest. "The commonest

44

example . . . is probably where the plaintiff suffers personal injuries in addition to mental distress as a result of negligent or intentional misconduct by the defendant." [Citation.] Pain and suffering is the natural concomitant of a personal injury. [Citation.]" ' " (*Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464, 472 (*Gonzales*).)

However, there are many other instances in which emotional distress damages have been awarded for intentional torts that did not result in a physical injury. (*Gonzales*, *supra*, 56 Cal.App.4th at pp. 472-473.) For example, the *Gonzales* court upheld an award of emotional distress damages resulting from the defendant's wrongful conversion of plaintiff's property. (*Ibid.*) Furthermore, even in negligence cases, emotional distress damages are recoverable when (1) "the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object," or (2) the defendant's breach of some other legal duty proximately causes the emotional distress. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 985.)

Finally, MKA's unexplained reliance on *Erlich v. Menzes*, *supra*, 21 Cal.4th 543 is unavailing. Unlike that case, MKA's liability is not limited to negligence; it is vicariously liable for Guidi's intentional torts and directly and vicariously liable for elder abuse. Therefore, contrary to MKA's suggestion here, emotional distress damages were not awarded because of MKA's negligence.

For all these reasons, MKA has failed to substantiate its claim that emotional distress damages were not recoverable in this case.

### 2. The Civil Penalty Must Be Stricken

As noted in our factual summary, the trial court imposed a civil penalty under Civil Code section 3345 (section 3345). It calculated the amount of the award by starting with a base penalty of $200,000, applying a multiplier of 2.85, and awarding prejudgment interest from the date of Norman's 2007 investment in MKA. MKA contends that this penalty was not authorized under section 3345. Because we agree, we do not address MKA's alternative arguments that the court miscalculated the amount of the penalty or otherwise abused its power by awarding it against MKA.

45

Section 3345 applies " 'in actions brought by, on behalf of, or for the benefit of senior citizens or disabled persons, as those terms are defined in subdivisions (f) and (g) of Section 1761, to redress unfair or deceptive acts or practices or unfair methods of competition.' [Citation.] Subdivision (b) of Civil Code section 3345 allows for a recovery of up to three times the amount of a monetary award whenever 'a trier of fact is authorized by a statute to impose either a fine, or a civil penalty or other penalty, or any other remedy the purpose or effect of which is to punish or deter,' if the trier of fact finds any of the factors identified in the statute to exist." (*Clark v. Superior Court* (2010) 50 Cal.4th 605, 610, fns. omitted (*Clark*).)[11]

Section 3345 is not an independent cause of action; it authorizes a heightened recovery when the trial court has imposed a statutory fine, civil penalty or other remedy the purpose of which is to punish or deter. (*Clark*, *supra*, 50 Cal.4th at p. 615.) Although

---

[11] Section 3345, subdivision (b) states: "Whenever a trier of fact is authorized by a statute to impose either a fine, or a civil penalty or other penalty, or any other remedy the purpose or effect of which is to punish or deter, and the amount of the fine, penalty, or other remedy is subject to the trier of fact's discretion, the trier of fact shall consider all of the following factors, in addition to other appropriate factors, in determining the amount of fine, civil penalty or other penalty, or other remedy to impose. Whenever the trier of fact makes an affirmative finding in regard to one or more of the following factors, it may impose a fine, civil penalty or other penalty, or other remedy in an amount up to three times greater than authorized by the statute, or, where the statute does not authorize a specific amount, up to three times greater than the amount the trier of fact would impose in the absence of that affirmative finding:

"(1) Whether the defendant knew or should have known that his or her conduct was directed to one or more senior citizens or disabled persons. [¶] (2) Whether the defendant's conduct caused one or more senior citizens or disabled persons to suffer: loss or encumbrance of a primary residence, principal employment, or source of income; substantial loss of property set aside for retirement, or for personal or family care and maintenance; or substantial loss of payments received under a pension or retirement plan or a government benefits program, or assets essential to the health or welfare of the senior citizen or disabled person. [¶] (3) Whether one or more senior citizens or disabled persons are substantially more vulnerable than other members of the public to the defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct."

the treble recovery provision can apply to a remedy that is not characterized as a penalty per se, it must be based on a statutory remedy "in the nature of a penalty" which "has 'the purpose or effect' of punishing or deterring. [Citation.]" (*Id.* at p. 614, italics omitted.) Thus, for example, the *Clark* court found that "[b]ecause restitution in a private action brought under the unfair competition law is measured by what was taken from the plaintiff, that remedy is not a penalty and hence does not fall within the trebled recovery provision of Civil Code section 3345, subdivision (b)." (*Id.* at pp. 614-615.) On the other hand, courts applying *Clark* have found that section 3345 can be applied to treble a punitive damages award. (See, e.g., *Ross v. Pioneer Life Ins. Co.* (C.D.Cal. 2008) 545 F.Supp.2d 1061, 1064; *Alberts v. Liberty Life Assur. Co.* (N.D.Cal. June 2, 2014, No. C-15-01587-RS) 2014 U.S. Dist. Lexis 75350, at *17; *Johnston v. Allstate Ins. Co.* (S.D.Cal. May 23, 2013, No. 13-CV-574-MMA(BLM)) 2013 U.S. Dist. Lexis 73424, at *13.)

In this case, MKA contends that the trial court erroneously used section 3345 to "levy a penalty in the first instance." According to MKA, the "$200,000 amount appears to be a number picked out of thin air." Gae counters that the $200,000 obviously represents the amount of Norman's 2007 investment, and she posits that the trial court imposed that penalty under Civil Code section 3294, which authorizes an award of punitive damages in order to punish and deter fraud.

Although we agree with Gae that the $200,000 figure that the court used to calculate this penalty was likely premised on the amount of Norman's 2007 investment, it does not appear that there was any statutory basis for awarding that amount as a penalty in addition to the damages to which Norman was otherwise entitled. The trial court made an express finding that it was not awarding punitive damages against MKA. Furthermore, despite its detailed statement of decision, the court did not reference any statute which authorizes a penalty or other remedy intended to punish or deter MKA under the circumstances presented here. Thus, the civil penalty imposed under section 3345 must be stricken from the judgment.

## IV.

## DISPOSITION

The penalty imposed under Civil Code section 3345 in the amount of $570,000 is hereby stricken.  The amended judgment is otherwise affirmed.  Costs on appeal are awarded to Gae.

_____

RUVOLO, P. J.


I concur:


_____

REARDON, J.

**RIVERA, J., Dissenting:**

I agree with the majority that MKA is liable for its own acts and omissions in its dealings with Norman Thiel. I part company with my colleagues only insofar as they conclude that MKA is also liable for the acts and omissions of ePlanning and its registered representative, Guidi. It is my view that the contract between MKA and ePlanning did not create a principal-agency relationship, and therefore MKA is not vicariously liable for ePlanning's and Guidi's fraud, breach of fiduciary duty, and elder abuse.

## A. Standard of Review

"Ordinarily, the question of agency is one of fact; however, where the evidence is undisputed the issue becomes one of law." (*Magnecomp Corp. v. Athene Co.* (1989) 209 Cal.App.3d 526, 536; see *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 642, fn. 19 [agency is generally a question of fact, but the issue may be decided as a matter of law if the undisputed facts negate any such relationship]; *Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 214 [existence of agency is question of fact unless evidence is susceptible of only one inference].)

The facts relating to agency in this case are undisputed. The majority nevertheless defers to the trial court's "finding" of agency and applies the substantial evidence test (Maj. Opn. *ante*, at pp. 27, 32, 34, 36, 39, 42), apparently concluding that the evidence gives rise to "conflicting inferences" that were resolved by the trial court as a factual question. I do not so read the trial court's statement of decision.

The court's analysis was brief. It recited the statutory definition of an agency and of agency authority (Civ. Code, §§ 2295 & 2317); it cited cases stating that proof of an agency relationship can be established by " 'evidence of the acts of the parties and their oral and written communications' "; and it rejected MKA's contention (that an independent contractor cannot also be an agent) as having "no basis in law." Turning to

1

the facts, the court recounted the expert's testimony that MKA "needed" ePlanning in order to operate, that is, "[MKA's] Qualified Fund could not solicit investors directly—it had to use agents so as not to violate SEC rule 501(a), Regulation D." The court then stated, "[a]n agency relationship results when there is a manifestation of consent among [sic] the principal and agent by express agreement that enumerates how the agent shall act on behalf of the principal and be subject to its control," and went on to conclude that the Placement Agent Agreement (the Agreement) created an agency relationship because it "explained" the terms under which ePlanning would provide its services to MKA.

The trial court applied what it believed to be the correct legal principles to the undisputed testimony and its interpretation of the contract. The trial court made no mention of factual disputes or conflicting inferences. I therefore read the statement of decision as determining this issue as a matter of law. Further, any conflicting inferences arising out of the Agreement between MKA and ePlanning involve the interpretation of a contract, which is a legal issue. (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [the interpretation of a contract is a question of law both for the trial court and the appellate courts].) Consequently, our review should be de novo.

**B. Essential Elements of an Agency**

A true agency is a fiduciary relationship in which (1) the agent has the power to act on behalf of the principal vis-à-vis third parties and (2) the principal has the power to control the agent's activities.

The use of the word "agent" in an agreement is not determinative of the nature of the relationship. "Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling." (Rest.3d Agency, § 1.02; see *Kuchta v. Allied Builders Corp.* (1971) 21 Cal.App.3d 541, 548 (*Kutcha*) ["the declarations of the parties in the agreement respecting the nature of the relationship are not controlling"].)

2

" ' "The chief characteristic of the agency is that of representation, the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties.  [Citations.]" [Citation.]  "The significant test of an agency relationship is the principal's right to control the activities of the agent.  [Citations.]" ' " (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 620 (*Violette*).)

The Restatement defines agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall *act on the principal's behalf* and *subject to the principal's control*, and the agent manifests assent or otherwise consents so to act."  (Rest.3d Agency, §1.01, italics added.) "An agency relationship arises only when the elements stated in §1.01 are present."  (*Id.* §1.02.)

### 1.  *Representation (the agent's power to act on behalf of the principal)*

"The essence of an agency relationship is the delegation of authority from the principal to the agent which permits the agent to act 'not only *for,* but *in the place of*, his principal' in dealing with third parties."  (*Channel Lumber Co. v. Porter Simon* (2000) 78 Cal.App.4th 1222, 1227 (*Channel Lumber*).)  This element of agency, although applicable in any context, is most often discussed in the cases distinguishing insurance "brokers" from insurance "agents."

Although the terms "broker" and "agent" are defined by statute (Ins. Code, §§ 31, 33), disputes nevertheless arise concerning which characterization pertains in a particular transaction.  Applying both the Insurance Code and general principles of agency, courts have consistently held that one who represents the insurer and has the *power to bind* the insurer to an insurance contract is an agent, whereas one who serves as an intermediary

3

between the insured and the insurer, and with *no authority to bind* the insurer to a contract, is not an agent, but only a broker.[1]

A broker acts as a middleman between the insurer and the insured; a broker places an order with an insurance carrier selected by the broker or its customer, whereas an insurance agent is authorized to transact insurance business on the carrier's behalf. (*American Way Cellular, Inc. v. Travelers Property Casualty Co. of America* (2013) 216 Cal.App.4th 1040, 1052.) Consequently, "[u]nlike an agent, a broker does not act for the insurer, and the insurer is not liable for the broker's acts or omissions." (*Ibid.*)

The facts of our case are congruent with this construct. MKA did not empower ePlanning or its representatives to act on its behalf to accept investors for MKA's Qualified Fund; indeed, the Agreement explicitly withheld from ePlanning any authority to bind MKA to any obligation to the potential investors: "[MKA] shall decide whether to accept the offer to invest made by each prospective investor, in MKA's sole discretion." "MKA reserves the right to reject any offer . . . by a prospective investor referred by Broker [ePlanning]." Thus, ePlanning's function was to act as a middleman. Just as an insurance broker offers its customers a variety of insurance products, assists them in identifying which carrier would best serve their needs, and then forwards its customers' applications for insurance to carriers, so, here, the broker-dealer's role was to offer a variety of investments—including MKA's Qualified Fund—to its clients, assist them in understanding the risks and benefits of the investments, and (as to MKA) forward

---

[1] See, e.g., *Marsh & McLennan of Cal., Inc. v. City of Los Angeles* (1976) 62 Cal.App.3d 108, 117 ["[t]he most definitive characteristic of an insurance agent is his authority to bind his principal, the insurer; an insurance broker has no such authority"]; *Douglas v. Fidelity National Ins. Co.* (2014) 229 Cal.App.4th 392, 411 [hallmarks of insurance agent include power to bind the insurer]; *Rios v. Scottsdale Ins. Co.* (2004) 119 Cal.App.4th 1020, 1026 (*Rios*) [the "general rule" is that a broker who has no binding authority is not a general agent for the insurer; the insurance code is consistent with this rule]. As is discussed, the same principle applies outside of the insurance arena.

4

the prospective investors' applications to MKA. Under no circumstances could ePlanning "alter the legal relations between [MKA] and third persons." (*Alvarez v. Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 999 (*Alvarez*).) Because ePlanning was never authorized to bind or to act on behalf of MKA, " 'the chief characteristic' " of agency is not present. (*Violette, supra*, 16 Cal.App.4th at p. 620.)

The majority concludes that the *lack* of authority to bind MKA cuts in favor of finding a principal-agent relationship because it purportedly demonstrates that MKA was exercising control over ePlanning's "representation" of MKA. (Maj. Opn. *ante*, at p. 29.) No authority is cited for this assertion. As the cases demonstrate, the absence of authority to bind a principal tends to disprove rather than prove an agency. (See, e.g., *Champlaie v. BAC Loans Servicing, LP* (E.D. Cal. 2009) 706 F.Supp.2d 1029, 1056–1057 [agency claim fails where no allegation that lender gave loan broker authority to represent or bind lender].) [2]

The majority points out that an insurance broker can actually be a dual agent—it is the agent of the customer for whom it procures insurance, but it can also act as the "agent" of the insurer for narrow purposes, such as collecting the premiums and delivering the policy to the insured—citing *Maloney v. Rhode Island Ins. Co.* (1953)

---

[2] The majority uses the term "representation" to describe ePlanning's function under the Agreement. (Maj. Opn. *ante*, at p. 29.) It is true that ePlanning can be described in the vernacular as MKA's "representative" for the purpose of marketing MKA's product to investors. But the term "representation" in agency law has a more specific meaning: A true agent acts not only " 'for' " but actually " 'in place of' " the principal " 'for the purpose of bringing him or her into legal relations with third parties.' " (*Violette, supra*, 16 Cal.App.4th at p. 620; *Channel Lumber, supra*, 78 Cal.App.4th at p. 1227.) The Agreement nowhere identifies ePlanning as MKA's "representative" and nowhere authorizes ePlanning to take any legally binding action on MKA's behalf or in its name. ePlanning was engaged to identify qualified investors and *offer* them MKA's product; it did not act as MKA's representative (in the agency sense) because it could not.

115 Cal.App.2d 238 (*Maloney*), *Mark Tanner Construction, Inc. v. Hub Internat. Ins. Servs., Inc.* (2014) 224 Cal.App.4th 574 (*Mark Tanner*), and *Rios, supra*, 119 Cal.App.4th 1020. But acting as an agent simply to be a pass-through conduit between two parties is not the kind of agency that creates vicarious liability, and that is clear from the cases. *Maloney* stands only for the principle that a broker who places a policy with an insurer, and accepts the premium payment for that policy, is acting as the insurer's agent with respect to that payment and therefore has a fiduciary duty to turn over the premium to the insurer (or the insurer's conservator). (*Maloney*, at pp. 244–247.) Nothing in *Maloney* would support the proposition that a broker acting as an insurer's agent to collect a premium will thereby make the insurer vicariously liable for misrepresentations made by the broker to its customer. In fact, in *Rios*, the court held that the insurer was *not liable* as a matter of law for a broker's negligence or misstatements to his customer because the broker was *not* the insurer's agent, although he served as its "agent" for the purpose of collecting the premium and delivering the policy. (*Rios, supra*, 119 Cal.App.4th at p. 1025–1027.)[3]

In this same vein, the majority also observes that agents who lack authority to bind their principles can still have authority to do other things on their behalf, such as negotiating or transmitting information, citing *Mason v. Mazel* (1947) 82 Cal.App.2d 769. But *Mason* does not support the notion that this kind of authority creates a true agency relationship, i.e., one that results in vicarious liability, and the cases tell us the opposite. In *Mason*, a seller gave an agent the exclusive listing to sell his property but did not empower the agent to enter into contract of sale; the seller was therefore not liable

---

[3] The third cited case, *Mark Tanner*, is irrelevant to this discussion because although it mentions the principle stated in *Maloney*— that an insurance broker can act as an insurer's agent "by collecting the premium and delivering the policy"—there was no agency issue involved in that case. (*Mark Tanner, supra*, 224 Cal.App.4th at p. 584.)

6

to the third-party buyer for specific performance of the contract signed by his agent.  (*Id.* at p. 774; see *Toth v. Metropolitan Life Ins. Co.* (1932) 123 Cal.App. 185 [representation to third party by soliciting agent that he would deliver policy did not create liability for insurer because agent's authority limited to soliciting insurance policy applications].)

Here, MKA authorized ePlanning only to *solicit* its clients to invest in MKA's fund.[4]  The majority characterizes this as a "special agency" (as distinguished from a "general agency") and suggests that this was the trial court's finding.  (Maj. Opn. *ante*, at p. 29.)  I do not find any such distinction in the trial court's statement of decision, but in any event, labeling ePlanning's contractual obligations as a "special agency" adds nothing to the analysis.  The question is whether ePlanning and MKA have the kind of principal-agent relationship that, like an employer-employee relationship, legally implicates the doctrine of respondeat superior.  I conclude it does not because MKA could not empower ePlanning to act on its behalf to fulfill regulatory requirements (Maj. Opn. *ante*, at pp. 23–24) and ePlanning could not act on MKA's behalf to bind it to any obligations to third parties.  Therefore, ePlanning was not acting *on behalf of MKA* for any purpose, but was merely a conduit by which MKA introduced its product into the marketplace.  The first core attribute of an agency—that of representation—is therefore absent.

### 2. Control (the power of the principal to control the activities of the agent)

" ' "The significant test of an agency relationship is the principal's right to control the activities of the agent." ' "  (*Violette, supra*, 16 Cal.App.4th at p. 620.)  In order to create an agency relationship, however, the "control" must be appreciably greater than the general supervisorial authority commonly found in a service or franchise contract.

---

[4] ePlanning was expressly *not authorized* to make any representation about MKA's product that was not consistent with MKA's own materials.

7

The case of *Stilson v. Moulton-Niguel Water Dist.* (1971) 21 Cal.App.3d 928 (*Stilson*) is instructive.

In *Stilson*, the plaintiff was injured while working on a construction project. The owner (Owner) of the project hired the plaintiff's employer to do the construction and another firm (Boyle) was hired to be the supervising engineer. All parties agreed that plaintiff's injuries were caused by the negligence of his employer. The trial court directed a verdict in favor of plaintiff against Owner and Boyle on the theory that plaintiff's employer was an agent of both Owner and Boyle, who were therefore vicariously liable for the employer's negligence. (*Stilson, supra*, 21 Cal.App.3d at pp. 932–933.)

The court of appeal affirmed the verdict, but on a different ground. The court, however, provided a discursive analysis on the subject of agency, and specifically on the level of control required to find an agency relationship.

"A major consideration in determining an agency relationship exists is whether an employer retains a right of control over one whom he employs not only as to the result of the work done but also as to the mode of accomplishing the work. [Citations.]" (*Stilson, supra*, 21 Cal.App.3d at p. 935.) "[T]he control which an owner may exert in his general supervisory power over work done at his behest may be a broad general power of supervision without changing a relationship from employer-independent contractor to one of agency." (*Id.* at p. 936.) An owner " 'may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect [citation], the right to stop the work [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation]—without changing the relationship from that of owner and independent contractor or [changing] the duties arising from that relationship.' [Citation.]" (*Stilson, supra*, 21 Cal.App.3d at

8

p. 936.)  In short, the most important factor of an agency relationship is the right to control "the manner and means of accomplishing the result desired."  (*Ibid.*)

I will discuss below why I conclude the Agreement does not assign to MKA any control over the "mode of accomplishing" nor the "manner and means" of conducting the brokerage services to be provided by ePlanning.  First, however, I address preliminary issues pertaining to the opinion in *Stilson*.

The majority describes *Stilson* as addressing whether the plaintiff's employer "was an employee *or* an independent contractor of the hirer" which is "substantively different" from the issue before us.  (Maj. Opn. *ante*, at p. 30.)  While the plaintiff in *Stilson* did argue that the Owner and Boyle were his "statutory employers" under Labor Code § 6304, he argued, primarily, that the contract between his employer and the Owner created an agency relationship, and the directed verdict was granted on that basis. (*Stilson, supra*, 21 Cal.App.3d at p. 933.)  The discussion in *Stilson* indisputably sets forth the standards for the nature of control required to find an *agency* relationship that imparts vicarious liability to a hirer.  (*Stilson, supra*, 21 Cal.App.3d at pp. 933–937.)[5]

The majority also cites S*tilson* as demonstrating that "even when the circumstances are undisputed, the totality of the evidence may be susceptible to more than one reasonable inference depending on a multitude of potentially relevant factors." (Maj. Opn. *ante*, at p. 32.)  But the agency issue in *Stilson* was deemed a fact question not

---

[5]  Essentially the same factors are used to decide whether an agency relationship exists as are used to determine whether there is an employer-employee relationship. (Cf. *Stilson, supra*, 21 Cal.App.3d at p. 936.)  "Generally speaking, whether a person is an independent contractor or an agent is determined by the same rules as those applicable in determining whether [s]he is an independent contractor or an employee.  [Citation.]" (*Rogers v. Whitson* (1964) 228 Cal.App.2d 662, 671; see *Jackson v. AEG Live, LLC* (2015) 233 Cal.App.4th 1156, 1184.)  The fact that an independent contractor cannot also be an employee but *can* also be an agent does not change the analysis.  (See, e.g., *City of Los Angeles v. Meyers Bros. Parking System, Inc.* (1975) 54 Cal.App.3d 135, 138–139.) A core element of agency is always control.

because of a "multitude of . . . relevant factors," but only because the evidence showed *conflicting levels of control*—the parties' conduct reflected only supervisorial power but a contract provision gave Owner the "unlimited power to discharge" suggesting a much higher degree of control. (*Stilson, supra*, 21 Cal.App.3d at p. 937.) On that basis, the court concluded the agency determination could not be made as a matter of law. (*Ibid.*) The court in *Stilson* did identify nine potentially relevant factors. Regarding those, it stated, the "most important factor" of an agency or employee relationship is the right to "control the *manner and means* of accomplishing the result desired," but it did not apply any of the other factors. (*Id.* at p. 936, italics added.)

Of the remaining eight factors—which have been enumerated in the majority's opinion (Maj. Opn. *ante*, at pp. 30–31)—the majority relies on only two to support its conclusion that there was an agency relationship: " ' "whether the work is part of the 'principal's' regular business" ' " and " ' "whether or not the parties intended to create an [principal and agent] relationship." ' "[6] (Maj. Opn. *ante*, at p. 31.) While I disagree that either of those factors support an agency on this record, I will not belabor the issue. It is sufficient to say that at least five of the remaining six factors point in the other direction, and, in any event, without the primary element of control, the secondary factors carry little weight. (See *Jackson, supra*, 233 Cal.App.4th at p. 1181.)

I turn, now, to the issue of how much control creates a true agency.

This question is discussed most frequently in franchise cases, where plaintiffs seek to hold franchisors liable for the torts of their franchisees. A robust body of law has developed in this arena, applying the well-established tenets of agency, all consistent with

---

[6] For example, the majority interprets the Agreement as evincing the parties' belief that they were creating an agency because they used the term "placement agent." But the phrase "placement agent" in this context is more likely to be a term of art that describes an entity, such as a broker, that plays the role of intermediary in bringing together investors and sellers of securities. (See, e.g., Government Code §§ 7513.8 subd. (f)(1); 82047.3.)

10

the principles enunciated in *Stilson*. "In determining whether a true agency relationship exists between a franchisor and franchisee, the courts focus on the right to control. [Citations.] If the 'franchise agreement gives the franchisor the right of complete or substantial control over the franchisee, an agency relationship exists. [Citation.]' " (*Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 745 (*Kaplan*); see *Cislaw v. Southland Corp.* (1992) 4 Cal.App.4th 1284, 1291 (*Cislaw*) [it is the right to control the *means and manner* in which the result is achieved that determines whether a principal-agency relationship exists].)

So, for example, in *Cislaw*, the parents of a minor who died of respiratory failure after smoking clove cigarettes purchased at a 7-Eleven store unsuccessfully sued the franchisor under an agency theory. The franchise contract provided that the franchisees were independent contractors and gave them the right to make all inventory, employment and operational decisions, including the right to hire, fire, supervise, discipline, and compensate its employees. But the agreement also obligated the franchisee to keep the store property clean, to maintain the equipment in good repair, to carry an inventory "consistent with the 7-Eleven image," to operate the store during specified hours 364 days per year, to deposit receipts into a designated account, to provide the franchisor with copies of purchase and sales records, and to pay a percentage fee based on net receipts. (*Cislaw, supra*, 4 Cal.App.4th at pp. 1293–1294.) The court concluded these provisions did not create a triable issue of fact as to whether the franchisees were agents of the franchisor; this was because the agreement did not give to the franchisor control over the "means and manner" of carrying out the franchise contract. (*Id.* at p. 1295.) A franchisor, the court concluded, "must be permitted to retain such control as is necessary to protect and maintain its trademark, trade name and goodwill, without the risk of creating an agency relationship with its franchisees." (*Ibid.*; see *Kaplan, supra*, 59 Cal.App.4th at p. 746 ["[a]bsent a showing that [the franchisor] controlled or had the

11

right to control the day-to-day operations of [the franchisee's] office, it was not liable for [the franchisee's] acts or omissions as a real estate broker on a true agency-respondeat superior theory"].)[7]

In contrast, the courts have held that a principal-agent relationship does exist where a franchisor exercises pervasive control over the franchisee. (See *Kuchta, supra*, 21 Cal.App.3d at p. 547 [franchisor controlled builder-franchisee's performance of every aspect of its construction, from plans and specifications through work in progress to completion of the project]; *Nichols v. Arthur Murray, Inc.* (1967) 248 Cal.App.2d 610, 615–616 [franchisor retained the right to control day-to-day operational decisions, and to direct all aspects of employment, the dealings between the franchisee and dance students and most matters relating to operational expenses]; *Porter v. Arthur Murray, Inc.* (1967) 249 Cal.App.2d 410, 415–417, 421 [same].)

These "control" standards, while elucidated most often in the franchise context, are applicable generally. (See, e.g., *City of Los Angeles v. Meyers Bros. Parking System, Inc.* (1975) 54 Cal.App.3d 135, 138–139 [parking lot manager acted as agent of owner where owner maintained control of parking lot's budget, its "operating policy" (parking rates, validation privileges, parking commitments) and, to a large degree, its personnel]; *ING Bank v. Ahn* (N.D.Cal. 2010) 758 F.Supp.2d 936, 942–943 (*ING Bank*) [loan broker not agent of lender where contractual obligations were supervisory and left day-to-day management to the broker].) These standards are also consonant with the federal

---

[7] I agree with the majority that the case of *Patterson v. Domino's Pizza* (*Patterson*) (2014) 60 Cal.4th 474 is not particularly useful in analyzing the vicarious liability issue before us (Maj. Opn. *ante*, at pp. 32–34), other than reiterating the general principle that, in the absence of the "traditional right of general control an 'employer' or 'principal' has over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees," there is no basis for finding an employment or agency relationship between a franchisor and a franchisee. (*Patterson*, at p. 503.)

12

regulation describing who is a "controlling person" for purposes of vicarious liability for another's violation of securities law. "[T]he SEC has defined 'control' generally to mean 'the possession, direct or indirect, of the power to direct or cause the direction of the *management and policies* of a person whether through the ownership of voting securities, by contract, or otherwise.' [Citation.]" (*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC* (D. Conn. 2011) 792 F.Supp.2d 328, 336 (*Poptech*), italics added.)

In responding to MKA's arguments, the majority correctly observes that the test of agency is not whether the hirer exerts "almost complete control" over the independent contractor (Maj. Opn. *ante*, at p. 30) nor whether the contractor was the hirer's agent "for all business purposes" (Maj. Opn. *ante*, at p. 33). But the majority does not then identify or apply the *actual* test for agency, which centers on whether the hirer has a measure of control over the contractor that is distinctly greater than the hirer's general supervisorial authority. (*Stilson, supra*, 21 Cal.App.3d at p. 936.) The point being, a hirer does not have to risk altering the legal relationship between itself and a contractor—becoming the contractor's employer or principal for purposes of liability—simply because it exercises general control over the hirer's work to ensure satisfactory performance of the contract. (*Ibid.*)

The inquiry, then, is whether the provisions governing ePlanning's handling of MKA's product gave MKA the kind of control over ePlanning that would create a principal-agent relationship, or whether those provisions were merely an exercise of general supervisory powers.

The relevant portions of the Agreement set forth a series of contractual obligations: The broker agreed to use reasonable efforts to procure qualified subscribers for MKA's Qualified Fund, to distribute MKA's materials only to clients reasonably determined to be qualified, to keep records as to the clients who received the materials, to assist the clients in understanding the materials, to comply with all laws and regulations,

13

to retain information for four years, and to use no sales materials not first approved by MKA. For its part, MKA obligated itself to collect and review the Purchaser Questionnaires and decide whether, in its sole discretion, to accept the client's offer to invest; to communicate its decision to ePlanning; to deliver all requisite materials to the investor; to be subject to all the broker's obligations if MKA itself makes a concurrent offer; to comply with all laws and regulations; and to compensate ePlanning for investments referred by ePlanning and accepted by MKA.

In analyzing these provisions, the majority does not discuss the *nature or extent* of control required to create an agency. Instead it merely characterizes the provisions of the contract "as though the level of control they convey is self evident." (*ING Bank, supra*, 758 F.Supp.2d at p. 942.) The majority interprets the provisions of the Agreement as controlling "in large part" the interactions of ePlanning with its prospective investors, such as "who could invest, what material would be provided to potential investors, what records ePlanning was required to keep; how ePlanning representatives were to interact with clients; what actions by ePlanning representatives required MKA's express prior approval; and what provisions of the securities law governed the transactions." (Maj. Opn. *ante*, at p. 29.)

This overstates the contract. It is not the Agreement that determines what regulations govern ePlanning's actions, what records must be kept or who can invest, it is the regulations themselves. Indeed, even in the absence of such provisions, a broker is independently obligated to comply with the securities regulations governing the offering of private placements under Regulation D and to ensure that the investment is suitable for the customer. (See FINRA Reg. Notice 10-22 ["[A]ny broker-dealer that recommends securities offered under Regulation D must meet its suitability requirements under NASD Rule 2310 (Suitability), and must comply with the advertising, supervisory and record-keeping rules of FINRA and the SEC"].) But even if the majority's characterizations

14

were accurate, they "misapprehend agency law." (*ING Bank, supra*, 758 F.Supp.2d at p. 942.) The exercise of supervisory powers is not relinquished when hiring an independent contractor. "The law merely requires that day-to-day management of the independent contractor's business be left to the independent contractor." (*Ibid.*) Applying agency principles, the provisions adverted to by the majority are, at most, general supervisory directives and do not approach the level of control that would create a true principal-agent relationship.

*ING Bank* is instructive, and is factually very similar to the case at hand.[8] There, the bank entered into a contract with a loan broker authorizing it to solicit prospective borrowers for loans to be underwritten by the bank. (*ING Bank, supra*, 758 F.Supp.2d at p. 938.) The contract was thirteen pages long, and contained numerous requirements, "rang[ing] from the general—follow all laws, communicate with borrowers, submit accurate information—to the specific—obtain the borrower's signature on the application, coordinate the collection of documentation, ensure that borrowers sign an agreement disclosing that [bank] and [broker] have a contractual relationship." (*Ibid.*) The contract also provided that the broker was not the bank's agent, and was free to solicit loans on behalf of other mortgage lenders. (*Ibid.*)

The plaintiffs (the Ahns) submitted to the broker an application for a loan; the broker falsified the application, stating that the Ahns had substantially more income than shown in their paystubs. (*ING Bank, supra*, 758 F.Supp.2d at p. 938.) Additionally, the loan broker violated Civil Code § 1632 because it failed to provide the Ahns with a Korean translation of the loan agreement, after negotiating with the Ahns entirely in Korean. (*Id*. at p. 940.) The loan was placed with the bank; the Ahns defaulted; the bank

---

[8] Although they are not binding precedent, we may consider relevant federal district court opinions as persuasive. (*Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419, 1432, fn. 6.)

15

sued for judicial foreclosure; and the Ahns counterclaimed against the broker and the bank for fraud, unfair business practices and violation of Civil Code § 1632. (*Id.* at pp. 938–939.)

The Ahns moved for summary judgment against the bank on its claim for rescission based on the violation of Civil Code § 1632. (*ING Bank, supra*, 758 F.Supp.2d at p. 940.) Under applicable precedent, a lender is not liable for a violation of the statute unless the lender either acted as a broker or had an agency relationship with the broker. (*Ibid.*) Since the bank was not a broker, the issue was whether the bank and the broker were in an agency relationship. (*Id.* at p. 941.)

The Ahns' agency argument focused on two questions. First, whether the broker had the power to alter the bank's relationships and second, whether the bank had the right to exercise control over the broker. (*ING Bank, supra*, 758 F.Supp.2d at p. 941.) The court readily concluded the broker had no power to alter the bank's legal relationships. It further concluded the Ahns had not proven that the bank had the right to "exert the kind of control over [the broker] that gives rise to an agency relationship." (*Ibid.*)

The Ahns' primary "control" argument was premised on the terms of the contract, which they described as "replete with directives, mandates and responsibilities with which [the broker] was obligated to comply in exchange for [the bank's] commission payment." (*ING Bank, supra*, 758 F.Supp.2d at p. 942.) The court concluded, however, that the provisions—which were, in fact, numerous and detailed—were not "nearly comprehensive enough to suggest that [the bank] was doing anything other than supervising an independent contractor."[9] (*Ibid.*)

---

[9] The contract provisions included the following requirements: The broker must "(1) ensure that borrowers sign a disclosure agreement; (2) analyze the borrower's income and debt; (3) describe to the borrower the types of loan products available; (4) complete the borrower's application; (5) obtain the borrower's signature on the application; (6) coordinate the collection of documentation; (7) order appraisals and inspections if necessary; (8) assist the borrower in understanding and resolving credit

16

The flaw in the Ahns' argument was to treat the provisions of the contract "as though the level of control they convey is self evident." (*ING Bank, supra*, 758 F.Supp.2d at p. 942.) This, the court concluded, misapprehends agency law. One need not relinquish supervisory powers when hiring an independent contractor. "The law merely requires that day-to-day management of the independent contractor's business be left to the independent contractor. Here, it was." (*Ibid.*) Additionally, the contract disclaimed an agency relationship—which was not dispositive, but a factor to be considered—and the broker was free to broker loans for other lenders, which also tends to negate an agency relationship. The court concluded that the evidence presented by the Ahns supported only one inference, "that [the broker] was acting as an independent contractor when it brokered the Ahns' loan." (*Id.* at p. 943.)

The Agreement between ePlanning and MKA contained similar, but fewer requirements. In it, ePlanning agreed to use "its standard reasonable efforts to procure qualified subscribers for the Units on the terms described in the Offering Memorandum" in exchange for compensation. The "manner and means" by which ePlanning was to carry out its "reasonable efforts" was left entirely to ePlanning, except that it was contractually obligated to help its clients read and understand MKA's materials, to be honest in describing MKA's offering, to clear marketing materials with MKA, to comply with applicable regulations, and to keep certain records. Nothing in the Agreement gave to MKA control of ePlanning's "day-to-day operations" (*Kaplan, supra*, 59 Cal.App.4th at p. 746) or of ePlanning's " 'management and policies' " (*Poptech, supra*, 792 F.Supp.2d at p. 336) as distinct from a general supervisorial power (*Stilson, supra*, 21 Cal.App.3d at p. 936).

issues; (9) communicate regularly with the borrower and gather additional documentation, if necessary; (10) facilitate the signing of closing documents; (11) disclose the relationship between [the bank and the broker]; and (12) certify it provided these services." (*ING Bank, supra*, 758 F.Supp.2d at p. 942.)

17

ePlanning was not only free to manage its day-to-day affairs as it saw fit, but was also free to determine to which qualified investors it would offer MKA's product, how best to describe the risks and benefits of various investments, including MKA's product, and the manner in which the investment would be presented. (See *Schweizer v. Keating* (D.Md. 2001) 150 F.Supp.2d 830, 840 (*Schweizer*).) The Agreement also left ePlanning free to sell products from other issuers and to solicit applications for other investments, (*ING Bank, supra*, 758 F.Supp.2d at p. 942), and either party could terminate the Agreement for any reason. The Agreement gave MKA neither the means nor the power to exercise any control or supervision over ePlanning or its representatives. MKA's only recourse in the event ePlanning or its representatives did not meet their contractual obligations was to terminate the contract on ten days' notice.[10]

Upon independent review, I would conclude that ePlanning's contractual obligations in connection with offering MKA's product are, as a matter of law, well below the threshold level of control that would manifest a true principal-agent relationship, i.e., one that creates vicarious liability. Rather, they are merely an enumeration of mostly regulatory-based supervisorial directions concerning a matter in which the contracting party is beneficially interested. (*Cislaw, supra*, 4 Cal.App.4th at p. 1295 [a person who has an interest in the work being performed by another is allowed to exercise a certain measure of control pertaining to the work without acquiring the responsibilities of a master].)

---

[10] MKA presumably could have prepared a contract that would accord it control over ePlanning with respect to its solicitations for MKA's product, but it did not do so. (Cf. *Asplund v. Selected Investments in Financial Equities, Inc.* (2000) 86 Cal.App.4th 26, 32 [broker contracted with registered representative to sell interests in broker's mutual fund; contract provided that sales representative would be independent contractor except that he was subject to the broker's "supervision and control" with respect to sales of the mutual fund].)

18

**C.** *Schweizer*

The majority rejects MKA's argument that a broker-dealer in a private placement offering can never legally be in a principal-agent relationship with the issuer, and I agree. (Maj. Opn. *ante*, at p. 39.)  But MKA also urges us to consider the case of *Schweizer, supra*, 150 F.Supp.2d 830, in which, on very similar facts, the court held as a matter of law that no agency relationship was created between an offeror of a private placement investment and the broker-dealer it hired to solicit investors.  I would agree with MKA that *Schweizer*, while not controlling, is nonetheless persuasive.  The majority rejects it as inapposite and unnecessary to our analysis because "the issues on appeal are readily resolved by applying California agency law to the evidence produced at trial."  (Maj. Opn. *ante*, at p. 37.)

California law *does* answer the agency question, but I disagree with the majority as to what that answer is.  Consequently—and because the *Schweizer* opinion is consistent with California law on the subject of agency—I shall respond to the majority's analysis of that case.

The facts of *Schweizer* are set forth in the majority opinion and will not be repeated here.  (Maj. Opn. *ante*, at pp. 37–38.)  Suffice to say, in that case, an offeror of a private placement investment (Ridgewood) entered into a "best efforts" agreement with a broker-dealer (Delta) (with key provisions comparable to those in the Agreement here). (*Schweizer, supra,* 150 F.Supp.2d at pp. 834, 840.)  Delta's registered representative and employee (Keating) convinced one of his clients to apply to be an investor in Ridgewood, even though the investment was inappropriate for that client, after Keating misrepresented to the client the nature of the investment.  (*Id.* at pp. 834–837.)  The issue in *Schweizer* was whether Ridgewood was vicariously liable to the investor for the misrepresentations made by Keating based on either a master-servant or an "actual agency by inference" theory.  (*Id.* at p. 839.)

19

The *Schweizer* court held that Ridgewood was not liable for Keating's wrongdoing as a master or employer because the provisions of the "best efforts" agreement were "insufficient to establish that the Ridgewood Defendants had the right to control Delta and its representatives." (*Schweizer, supra*, 150 F.Supp.2d at p. 840.) The court observed that most of the "control" provisions identified by Plaintiff—the same provisions relied upon by the majority here (Maj. Opn. *ante*, at pp. 29, 31)—were identical to those imposed under the applicable securities laws and were merely provisions which "responsible issuers would be expected to include . . . in selling agreements . . . in order to ensure compliance with the law." (*Schweizer, supra*, 150 F.Supp.2d at p. 840.) The court concluded, "Delta and its representatives retained a significant degree of discretion in selecting potential investors to whom trust shares would be offered and the manner in which the investment would be presented to the prospective buyer . . . . Plaintiff's assertion that the Ridgewood Defendants controlled Delta and its representatives in a manner that is indicative of a master-servant relationship is without merit." (*Ibid.*)

The majority dismisses *Schweizer* as inapposite because "this case presents a fundamentally different legal issue . . . , i.e., whether ePlanning was an agent, not whether it was an employee of MKA" (Maj. Opn. *ante*, at p. 38), and also because the District Court was determining whether the summary judgment evidence was sufficient to create an issue of fact whereas we are determining whether a trier of fact's finding is supported by substantial evidence (Maj. Opn. *ante*, at p. 39). As to the latter point, the distinction is irrelevant because both we and the District Court are applying the law to the undisputed facts to make a determination of agency. As to the former, it is true that *Schweizer* analyzed whether the "best efforts" agreement created the kind of control that characterizes an *employer-employee* relationship, and concluded that it did not. But, as has been noted, there is a substantial overlap in the factors for determining whether one is

20

an employee or an agent. (See *ante*, fn. 5.) In any event, that was not the only theory advanced by the plaintiff in *Schweizer*. He also argued, in the alternative, that there was an "actual agency by inference." (*Schweizer, supra*, 150 F.Supp.2d at p. 841.) The majority describes the *Schweizer* court as rejecting this theory "summarily." (Maj. Opn. *ante*, at p. 38.) I would not characterize it in that way.

Addressing the agency theory, the *Schweizer* court began by setting forth the three key elements of an "agency by inference," which are: "1) the agent was subject to the principal's right of control; 2) the agent had a duty to act primarily for the benefit of the principal; and 3) the agent held the power to alter the legal relations of the principal." [Citation.]" (*Schweizer, supra*, 150 F.Supp.2d at p. 841.) As has been described, elements (1) and (3) are two of the key elements of agency under California law.

The *Schweizer* court went on to conclude that the first element—that of a principal's right to control an agent—could not be proven "[f]or reasons discussed at length in the preceding subsection [of the opinion]" rejecting the master-servant theory. (*Schweizer, supra*, 150 F.Supp.2d at p. 841.) This is in keeping with California law, which applies the same general rules to determine whether there is an agency relationship or an employment relationship. (*Rogers, supra*, 228 Cal.App.2d at p. 671.)

As to the third element, the court determined there was "no legitimate claim that Delta had the power to alter the Ridgewood Defendants' legal relations" because it was undisputed that Ridgewood retained the ultimate authority to accept or reject potential investors presented by Delta. (*Schweizer, supra*, 150 F.Supp.2d at p. 841.) "Accordingly, there is no basis for inferring actual agency in the instant case." (*Ibid.*) Again, this is in keeping with California agency law. (*Alvarez, supra*, 230 Cal.App.2d at p. 999.)

Of course, a federal case from Maryland is not controlling here. But the facts and the law of that case are almost indistinguishable from the facts of this case and the law of

21

agency in California. I therefore disagree with the majority's characterization of *Schweizer* as addressing a "fundamentally different legal issue" than that presented in the case before us.[11] (Maj. Opn. *ante*, at p. 38.)

The majority also disagrees with the reasoning of *Schweizer*. According to the majority, the *Schweizer* court "disregarded the fact that the Ridgewood-Delta agreement allowed Ridgewood to retain control over the manner in which trust shares would be offered to potential investors solely because those 'control' provisions were designed to enable the offering to retain an exemption from the registration." (Maj. Opn. *ante*, at p. 39.) This misapprehends the reasoning of *Schweizer*. The court did not "disregard" the purported "fact" that the agreement "allowed Ridgewood to retain control over the manner in which trust shares would be offered to potential investors." To the contrary, the *Schweizer* court premised its discussion on the principle that "[t]he reservation of some control over the manner in which work is done does not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the execution of this duties. [Citation.]" (*Id.* at p. 840.) The *Schweizer* court then concluded the contractual provisions at issue were "*insufficient* to establish that the Ridgewood Defendants had the right to control Delta and its representatives" because Delta "retained a significant degree of discretion" in selecting potential investors to whom the trust

---

[11] The majority also seeks to distinguish this case from *Schweizer* on the ground that the term "placement agent" was used in the Agreement between MKA and ePlanning. (Maj. Opn. *ante*, at pp. 38–39.) But we cannot discern from the opinion whether that term was or was not used in the agreement in question in *Schweizer*. We do know that the contract at issue in *Schweizer* contained virtually identical disclaimer language as the "Authority" provision in the Agreement here: "[Delta's] relationship with [Ridgewood] is as an independent contractor and… nothing herein shall be construed as creating a relationship of partners, affiliates, joint venturers, or employer and employee, between [Delta] and [Ridgewood]." (*Schweizer, supra*, 150 F.Supp.2d at p. 839.)

22

shares would be offered as well as the manner in which the investment would be presented. (*Schweizer, supra*, 150 F.Supp.2d at p. 840, italics added.) The court also pointed out that Ridgewood had no involvement in Delta's hiring, discipline or dismissal of its representatives, nor Delta's compensation structure or calculation. (*Id*. at p. 841.) What the court concluded, in essence, is that the so-called "control" provisions did *not* control the "manner and means" by which Delta would carry out its contractual duties, and were mostly duplicative of the legal requirements Delta would have had to comply with anyway in order to serve as a  broker for private placements. (*Id.* at p. 840.)

In eschewing the rationale of *Schweizer* the majority expresses the view that when "a private placement issuer ma[kes] the decision to use a broker to solicit offers on its behalf in order to maintain its own exemption from securities law registration requirements," that fact "supports [an] agency finding." (Maj. Opn. *ante*, at p. 39.) But the mere decision of a private placement issuer to utilize an independent broker to solicit investors (in order to retain its exemption) is no more relevant to the issue of agency than an insurance company's decision to utilize independent brokers to solicit purchasers of its products (for whatever reason). What *is* relevant is whether, in carrying out that decision, the hirer has authorized the broker to act in its place to create binding legal obligations and whether the broker has ceded to the hirer not just a general supervisorial power, but the right to control the manner and means by which the broker conducts its business in carrying out the contract.

## D. Conclusion

MKA has been and should be held liable to plaintiff for its own acts and omissions. But MKA should not be held vicariously liable for the acts or omissions of ePlanning or Guidi. MKA did not empower ePlanning to approve investors for the Qualified Fund or to bind MKA to any obligations. ePlanning did not cede to MKA the power to control ePlanning's policies, personnel or business, nor to oversee or direct the

23

manner and means by which ePlanning's representatives would carry out the Agreement. Neither of the hallmarks of a true agency relationship are present here.

_____
Rivera, J.